FOLKWAYS BROADCASTING COMPA-
NY, Inc., Appellant,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,

F. L. Crowder t/a Harriman Broadcasting
Co., Intervenor.

No. 19971.

United States Court of Appeals
District of Columbia Circuit.

Argued Sept. 14, 1966.

Decided Jan. 5, 1967.

Tamm, Circuit Judge, dissented.

Mr. John B. Kenkel, Washington, D. C., with whom Mr. Arthur H. Schroeder, Washington, D. C., was on the brief, for appellant.

Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, General Counsel, John H. Conlin, Associate General Counsel, and William L. Fishman, Counsel, Federal Communications Commission, were on the brief for appellee.

Mr. Donald E. Bilger, Washington, D. C., for intervenor.

Before BAZELON, Chief Judge, and FAHY and TAMM, Circuit Judges.

FAHY, Circuit Judge:

Five years ago F. L. Crowder, trading as Harriman Broadcasting Co., intervenor on this appeal and referred to as Crowder, applied to the Federal Communications Commission, appellee, for a new standard broadcast station in Harriman, Tennessee. Folkways Broadcasting Company, Inc., appellant, is the licensee of AM radio station, WHBT, in Harriman. It petitioned the Commission to deny Crowder's application and alternatively to designate it for a hearing on issues set forth by Folkways. The Commission, however, on January 14, 1966, without a hearing granted the application for a construction permit for the station. Two Commissioners dissented and another filed a concurring statement. The latter expressed disapproval of *"Carroll"* issue standards previously adopted by the Commission in *Missouri-Illinois Broadcasting Co.,* 3 Pike & Fischer Radio Reg. 2d 232, but concluded independently of those standards that WHBT had failed to make out a prima facie case of economic injury. Our question is whether Folkways was entitled to an evidentiary hearing on any of the issues it presented.

Folkways' right to such a hearing depends upon whether its petition to deny, and data in support, considered with the reply of Crowder and other data properly before the Commission, met the requirements set forth in Section 309(d) of the Communications Act of 1934.[1] This section requires the petition to contain specific allegations to show petitioner's interests as a party, and to raise such substantial and material questions of fact as to necessitate an evidentiary hearing to enable the Commission to find that grant of the application would be in the public interest. Folkways, as licensee of a station which would be in competition with Crowder's was a party in interest. This is not disputed.

One of the issues presented by Folkways is whether Crowder made ef-

---

1. As amended, 74 Stat. 890, 47 U.S.C. § 309(d).

forts and, if so, of sufficient extent, to determine the tastes, needs and desires of Harriman and the area to be served, as required by the standards established by the Commission in its release of July 29, 1960, entitled "Report and Statement of Policy Re: Commission En Banc Programming Inquiry." In Henry v. FCC, 112 U.S.App.D.C. 257, 260, 302 F.2d 191, 194, *affirming Suburban Broadcasters,* 30 F.C.C. 1021, we held that under these standards the question is "simply whether the Commission may require that an applicant demonstrate an earnest interest in serving a local community by evidencing a familiarity with its particular needs and an effort to meet them." In the present case the Commission states that, "as a matter of judgment, the manner in which the survey was made leaves something to be desired," with which we agree; but our review of the record leaves us unconvinced that the Commission's clearance of Crowder on this issue should be set aside. We are of like mind on the related issue of misrepresentation, or failure to disclose any material fact, regarding the survey of community tastes, needs and desires. However, the record on this issue influences, though it does not control, our decision on the trafficking issue discussed *infra.*[2]

■■ Appellant also raised an issue as to Crowder's financial qualifications. Considering applicant's experience in the area, including broadcast experience, and knowledge of the business community to be served, we agreed that Crowder's estimate of anticipated revenues for the first year of operations, together with committed capital and assets, were not sufficienty brought in question to call upon the court to insist upon an evidentiary hearing which the Commission found unnecessary.[3]

■ On the trafficking issue—whether Crowder has engaged in trafficking of broadcast authorizations, and whether grant of its present application would create another opportunity for such trafficking, inconsistent with the public interest—we conclude that a hearing should have been held.[4] The record supports the factual situation now set forth as relevant to this issue.

Mr. Crowder obtained sole ownership of station WHBT in 1950[5] and operated this station until he sold it in 1956 at a profit of some 61,000 dollars. In September 1954, he was granted a construction permit for station WDEH, Sweetwater, Tennessee. He commenced its operation in February 1955 and sold it in January 1956 for 57,500 dollars, a profit of approximately 22,000 dollars.[6] In 1956 he also applied for and was granted a construction permit for station WLIV, Livingston, Tennessee, in which he held a fifty per cent interest, which he sold in 1964. In responding to Folkways' trafficking allegations in the present proceeding, Mr. Crowder represents that

---

2. The record indicates that in making the required survey seven letters from prominent citizens and local organizations were solicited by Crowder's former "commercial manager." These and eight other letters from organizations outside the business community were filed with the Commission. It developed that three of the solicited letters, though written on the letterhead of a local organization, were not official views of the organization, and the signers of these letters also disassociated themselves from some of the possible implications of the letters.

3. The Commission's brief, mistakenly we think, contends, or seems to do so, that this was a matter of discretion. To grant or not to grant a hearing is not a matter of Commission discretion. We think the Commission must be satisfied of an applicant's ability to meet all fixed charges and operating expenses during the first year of operations, including staff expenses. A hearing is a matter of right when the criteria of the Act are satisfied by the protesting party.

4. One of the bases for Commissioner Bartley's dissent was the refusal of the Commission to order a hearing on this issue.

5. He had maintained an interest in the station since 1946.

6. These figures, taken from appellant's petition to deny, are based in part on records of the Commission and are not disputed by Crowder.

in 1956 he was forced by ill health to sell his interests in WHBT and WDEH: "Upon a doctor's advice Mr. Crowder retired completely from active participation in the radio broadcast industry." However, when he applied for Commission approval of the two sales in 1956, he failed to give this reason though the Commission asked for a fuller statement of his reasons. It was not until 1963 that health reasons were suggested. Moreover, in 1956 when he was "retiring completely from the radio broadcasting industry," he was also applying for a license for the Livingston station, representing that he was to be a fifty per cent partner and the general manager of the station.[7]

The court cannot accept the Commission's conclusion of no inconsistency in these representations on the record before the Commission. The trafficking issue is a sensitive one vitally affecting the public interest represented by the Act administered by the Commission. Licenses cannot be granted in the public interest to those who seek them for sale rather than service. There may be a basis for reconciling the inconsistent representations in a manner which prevents disqualification of Crowder, but the subject needed examination at a live hearing. There is substance to the dissent of Commissioner Bartley, expressing his view that WHBT's petition to deny raised a serious question as to trafficking, requiring an evidentiary hearing to resolve the matter.[8] Crowder's response fails to resolve it. The fact that Crowder, as the Commission states, operated station WHBT from 1950 to 1956 before selling it does not answer the question; the question is not whether the trafficking intent arose prior to 1950, but whether

it arose at all. As to that, events which did not begin until 1956 are sufficient to require the probing of an evidentiary hearing.

We also think the *Carroll* issue needs further consideration by the Commission, that is, the issue whether the economics of the situation would lead to degradation of service to the public were Crowder's application granted. In Carroll Broadcasting Co. v. FCC, 103 U.S. App.D.C. 346, 258 F.2d 440, relying heavily upon FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869, we held that while economic injury to an existing station is not a ground for denying a new application, the basic charter of the Commission requires it to act in the public interest. This imposes upon the Commission a duty to determine whether the economic effect of another licensee in an area would be to damage or destroy service to an extent incompatible with the public interest, this depending upon the facts. The problem arises when a protestant, or, as in this case, one who petitions that an application be denied, offers to prove that for the reasons thus suggested the grant would be detrimental to the public interest and supports this position by a showing that is substantial enough to create a genuine factual issue. *Carroll* was decided in 1958. Congress amended the statute in 1960.[9] Thereafter we considered the problem anew in Southwestern Operating Co. v. FCC, 122 U.S.App.D.C. 137, 138 n.2, 351 F.2d 834, 835 n.2, decided in 1965, stating that the new legislation,

> created the device of a petition to deny, which must be filed in advance of hearing and, indeed, made it clear that no hearing need be held if that petition failed to "contain specific allegations

---

7. In his supplemental statement in the present proceeding Crowder stated that because his partner in the WLIV station was inexperienced he consented to hold a supervisory position termed "general manager." He now states that the title was "not wholly descriptive," for he was to serve in this capacity only during the preparatory stages of the application. Once the station was broadcasting he was

to be an advisor on an "as-needed basis." In the present application Crowder also claims he will be a "general manager"; but this time it is urged that his personal expertise and participation in the venture are factors to be considered in granting the application.

8. See note 4, *supra.*

9. 74 Stat. 889, amending 47 U.S.C. § 309.

of fact sufficient to show that the petitioner is a party in interest and that a grant of the application would be prima facie inconsistent with [the public interest, convenience and necessity] \* \* \*." 47 U.S.C. § 309(d) (1). If "there are no substantial and material questions of fact and \* \* \* a grant of the application would be consistent with [the public interest] \* \* \*" the petition shall be denied and the grant made without hearing. 47 U.S.C. § 309(d) (2). [But] \* \* if "a substantial and material question of fact is presented or the Commission for any reason is unable to make the [public interest] finding," the application shall be set for nearing on the issues raised.

We pointed out in *Southwestern* that "the temptation to an existing licensee to postpone as long as possible the advent of competition warrants special care by the Commission in the scrutiny of requests for hearing in *Carroll* circumstances." But we nevertheless held that the papers filed with the Commission in that case "raised substantial and material issues of fact which should have been exposed to the give-and-take of an evidentiary hearing." *Southwestern, supra* at 140, 351 F.2d at 837.[10]

■ There are several subsidiary considerations, pro and con, which arise in this area of administering the Act. In order to serve the basic interest of the public the Commission is entitled to insist upon more than conclusional allegations easily made and which, if accepted, entail unjustified delay and consumption of the Commission's time and energy. See Chief Judge Bazelon's dissent in *Southwestern*. The delay factor loses a good deal in significance in the present case in light of the long and unexplained delay in the proceedings unrelated to appellant's desire for a hearing.[11] As to specificity, the adverse economic impact of a new station upon an existing one and the degree to which this impact is detrimental, if at all, to the public interest, are not subject to exact calculation by the licensee. Assessment of these effects is ordinarily an informed judgment having some quality of prophecy. At times there might be a knowledge of a specific financial loss and its detrimental consequence on programming, but we think a *Carroll* hearing may not be limited to a case in which pre-knowledge of the exact economics of the situation is necessarily available. Requiring such precision would eliminate the doctrine as a practical matter. If the *Carroll* hearing is to continue, then some adjustment is required. The specificity of allegations referred to in Section 309(d) must not be construed to require such exactness as is practically impossible.

■ Folkways and intervenor placed before the Commission a good deal of economic data on the subject whether a third station in the same general area[12] would lead to economic injury to WHBT, which would in turn lead to degradation of service in Harriman and, therefore, be inconsistent with the public interest. In defending in this court its denial of a hearing the Commission states appellant's position to be, principally, that the Commission erred (1) in disregarding "Crowder's threat to engage in a rate

10. Subsequent to *Carroll* and prior to *Southwestern* we decided KGMO Radio-Television, Inc. v. FCC, 119 U.S.App. D.C. 1, 3, 336 F.2d 920, 922, holding that the decision of the Commission denying a petition for reconsideration because the showing of the licensee did not comply with the requirements of *Carroll* standards, as construed by the Commission, was erroneous because, although "it is within the Commission's authority to require more information than appellant gave \* \* \* since appellant had no no-

tice, in the Commission's past decisions or otherwise, that more would be required, the petition should not be denied." We remanded the case to the Commission.

11. Intervenor's application was filed October 4, 1961, and granted January 12, 1966.

12. In addition to WHBT, Roane County also has another station, WKRH, operating at Rockwood, Tennessee, which is ten miles from Harriman.

war," and (2) in insisting on requiring too detailed a showing of injury. We think the Commission has not satisfactorily met these criticisms. As to the allegedly threatened rate war, the Commission states a hearing would show simply that Crowder's proposed advertising rates would be substantially lower than Folkways' present rates. The Commission says, "There is no evidence to suggest that Crowder has threatened to engage in any unfair competitive practice or that he would be likely to do so." But no evidence was taken on the subject. And yet the issue of a threatened rate war to drive Folkways out of business was fully raised by allegations which if true posed a substantial question of public interest under the *Carroll* doctrine.

Folkways' petition to deny was accompanied by the affidavit of a Mr. Willis, and Crowder's opposition to this petition was accompanied by the counter-affidavit of a Mr. Scarbrough. These two affiants respectively were the advertising salesman and manager of a station in Oneida, Tennessee. It appears that in riding to work together they discussed advertising problems and frequently dwelt on the disparity of rates among the many area stations. Willis' affidavit attests that he was told by Scarbrough that Crowder planned to charge rates fifty per cent lower than those charged by WHBT in order to acquire WHBT's commercial advertisers. Furthermore, "in said discussion Mr. Scarborough indicated that he and Mr. Crowder understood that this would 'drive WHBT out of business' which Mr. Crowder and Mr. Scarborough would be glad to have happen." On the other hand, Scarbrough's affidavit brands Willis' statement a "complete falsehood." Scarbrough admits having knowledge of many of Crowder's plans, but denies having knowledge of the proposed rate structure. He states that Willis attempted to draw information from him, but "I completely denied and absolutely would not talk about any of Mr. Crowder's plans which I knew about." In a subsequent affidavit Willis reaf-

firmed his original statement. The discrepancies within and among these affidavits and the close relationships between the affiants and the parties demonstrate that a hearing, with opportunity to offer further evidence and cross-examine witnesses, was needful in resolving the rate war issue. This substantial issue was left unresolved though Crowder contended his proposed rates were in fact fifty per cent lower than those of WHBT.

In considering the *Carroll* issue, the Commission's opinion sets forth Folkways' allegations that the addition of another station would mean inadequate revenues for WHBT, a reduction of its staff, and curtailment of public service programs and community activities by station personnel, whereas there is no assurance the Crowder station would be able to replace the service lost. The showing of Folkways in these respects was held inadequate partially, though not entirely, because

> When afforded an opportunity to show what advertisers would shift their advertising to the new station, WHBT declined to 'speculate' on the contingency. WHBT asserts that the establishment of another station would result in a 'significant reduction or destruction' of service, but does not indicate the extent or nature of the significant reduction or destruction. * * * Absent an appropriate showing, including a showing of the specific relationship between any assumed losses in revenue to the withdrawal of particular programs or program service, the Commission cannot conclude that WHBT has raised an issue which would require a hearing.

Such a requirement seems to us to come too close to that nullification of the *Carroll* doctrine of which we have above warned. To require a specific advance showing that a particular program would be abandoned should the economic injury ensue would be to force an advance decision where some latitude should be left to management. The question is wheth-

er there would be degradation of public service resulting from the necessary abandonment of a program or programs within a range of programs some of which would have to be abandoned. Exposition of the matter by a hearing should not be denied simply because a petitioner has not specified the exact program the alleged loss would cause to be abandoned. So, too, as to possible loss of advertisers. Here a reasonable judgment by the licensee must be reached, supported in its reasonableness by a strong showing, but it need be only such a judgment, not an exact detail of facts—for example, not necessarily knowledge of specific advertising shifts.

The court does not relish the task of devising different standards from those adopted by the Commission. Undue interference by the court is itself contrary to the public interest, but we respectfully suggest that the Commission seek a ground upon which the *Carroll* doctrine can stand which will avoid unnecessary and time consuming hearings but which at the same time will not make the right to a hearing practically unattainable. We decide only that the reasons given by the Commission for the rejection of the *Carroll* hearing are not satisfactory.

By reason of the data before the Commission on the alleged threat of a rate war, and the possibility of unfair and ruinous competition, we think an evidentiary *Carroll* hearing was required. In other respects the *Carroll* issue should be reconsidered consistently with the views above expressed and a further evidentiary hearing afforded petitioner if upon such reconsideration as we indicate the Commission is unable to resolve the matter on the present record. Moreover, as previously stated, an evidentiary hearing on the trafficking issue is required.

The case is reversed and remanded for further proceedings not inconsistent with this opinion.

TAMM, Circuit Judge (dissenting):

I respectfully dissent from those conclusions of my brethren upon which they reverse and remand this case to the Commission. Upon the record before us, I would affirm the Commission.

### I

The majority opinion concludes that the Commission should have held a hearing on the trafficking issue. Trafficking, as a term of art in this context, denotes, essentially, the acquisition of broadcast licenses for resale rather than for operation. The practice of trafficking has consistently been regarded by the Commission as being contrary to the public interest. See amendment of Part 1 of the Commission's Rules, 23 Pike and Fischer R.R. 1503. In determining whether trafficking conditions exist, the Commission considers intention, timing, price (*Atlantic Coast Broadcasting Corp. of Charleston*), 22 Pike and Fischer, R.R. 1045 and the applicant's entire history of radio license acquisition and resale. (*Franklin Broadcasting Co.*, 22 Pike and Fischer R.R. 880).

F. L. Crowder, the applicant-intervenor in these proceedings, had a part ownership in Radio Station WHBT as early as 1946 and became sole owner of that station in 1950. He sold the station in 1956, after having owned it in whole or in part for ten years. Crowder was the sole owner of Radio Station WDEH for two years from 1954 to 1956. Prior to his present application, his only other interest in a broadcasting operation was a fifty per cent ownership of WLIV from 1956 to 1964. It follows, then, that over this eighteen-year period, Crowder has had a proprietary interest in three radio stations: one for 10 years, one for 8 years and one for 2 years. There is no evidence in the record that Crowder acquired any one of these stations for the purpose of selling it at a profit; nor is there any contention by any party to the proceedings that the resale price of any of Crowder's stations was exorbitant or at variance with the then current fair market value of the holdings. The consistency of the application of the Commission's policies in trafficking cases to

the factual situation in the current case is illustrated by Commission action in *Versluis Radio and Television, Inc.*, 9 Pike and Fischer R.R. 1123; *Good Radio, Inc.*, 23 Pike and Fischer R.R. 1036; and *Laramie Broadcasters*, 20 Pike and Fischer R.R. 423. Although I agree with the majority that the trafficking issue "is a sensitive one vitally affecting the public interest," I, nevertheless, cannot conclude on the facts in this case, viewed in the light of Commission rulings, that a trafficking issue requiring a hearing is even suggested by the record.

## II

My brethren express concern in their consideration of the trafficking issue relative to the "inconsistent representations" made by Crowder as to the reasons for his sale, in 1956, of his interests in Stations WHBT and WDEH and they therefore decline to accept the Commission's conclusion. As I have already pointed out, Crowder's ownership of interests in three radio stations spanned a period of nearly twenty years. Each transaction relating to the purchase or sale of those interests had been approved by the Commission, including Crowder's sale of appellant's present station. When appellant raised this question, the Commission called upon Crowder to supplement his pleading in this respect, and Crowder did so. Upon the supplemented record, the Commission found the alleged inconsistencies "more apparent than real." Although Crowder, in 1956, stated as his reason for the sale of his interest in Stations WHBL and WDEH that he "wanted to quit the broadcast business in Harriman and Sweetwater," the Commission found that his statement in the current proceedings and ill health was the reason for these sales was not so inconsistent as to warrant a charge of misrepresentation. To me, a contrary conclusion would be capricious.

The other alleged inconsistency relates to Crowder's statement to the Commission, in 1956, in applying for a license for the operation of a radio station in Livingston, Tennessee, that he would be a fifty per cent partner and general manager of the station. The inconsistency allegedly relates to his serving as general manager of a new radio station in Livingston while disposing of his interests in stations in Harriman and Sweetwater by reason of ill health. Called upon by the Commission, as a result of appellant's challenge, to enlarge upon this question, Crowder submitted additional information to the Commission. In substance, Crowder replied to the Commission that the term "general manager" was not "wholly descriptive" of the very limited activity he actually contemplated and performed. Crowder explained that because his brother-in-law, in 1956, desired to go into the broadcasting business, he, Crowder, agreed to act in "a supervisory capacity in the preparatory stages of the application, and until the station went on the air, and after that point in time he would act only as an advisor upon an as-needed basis." Crowder affirmed his fifty per cent ownership of the station, recounted that he recommended and hired attorneys and engineers, purchased equipment, "and the like." Crowder stated to the Commission that, after his initial activities when the station began broadcasting, he was not active in any capacity other than as an advisor to his brother-in-law. The Commission accepted these explanations and found that they were not inconsistent with the information furnished the Commission in 1956. Absent some specific allegation of factual inaccuracy in these matters, the Commission's action seems to me to be completely reasonable, within the orbit of its authority, and lacking any semblance of a situation requiring or justifying a hearing. Appraised realistically, I think the entire record of these "inconsistencies" is a mountainous molehill of triviality successfully injected into the proceedings solely for the purpose of effectuating delay of the Commission's and the court's disposition of the case.

### III

The majority finds in the record a *"Carroll* issue,"[1] *id est,* a question whether the economics of the situation would be so affected by the granting of a license to applicant as to lead to a degradation of service to the public, and remands this issue to the Commission for "further consideration." I think it is well to recall the economic facts of life which exist when an application for a new radio station threatens competition to the revenue of an existing station. We observed in Southwestern Operating Co. v. Federal Communications Comm'n, 122 U.S.App.D.C. 137, 351 F.2d 834, 835, n.2 (1965), that "the temptation to an existing licensee to postpone as long as possible the advent of competition warrants special care by the Commission in the scrutiny of requests for hearing in *Carroll* circumstances." There is, I fear, a tendency to extend the doctrine of the *Carroll* case far beyond its expressed teaching. Recalling that *Carroll* was bottomed upon the Supreme Court's opinion in Federal Communications Comm'n v. Sanders Bros. Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940), it appears important to emphasize that in that case on the issue of economic injury the Court said:

"We hold that resulting economic injury to a rival station *is not, in and of itself,* and apart from considerations of public convenience, interest, or necessity, *an element* the petitioner (Federal Communications Commission) *must weigh and as to which it must make findings, in passing on an application for a broadcasting license.*" 309 U.S., at 473, 60 S.Ct., at 696. (Emphasis supplied).

Thereafter, the Supreme Court pointed out, of course, that the economic effect of competition might have a "vital and important bearing upon the ability of the applicant adequately to serve his public." This statement is equally applicable to the ability of existing stations, faced with competition from an applicant, to serve their public. It was in recognition of these principles that we concluded in *Carroll, supra,* that:

"economic injury to an existing station, while not in and of itself a matter of moment, becomes important *when on the facts it spells diminution or destruction of service."* 258 F.2d at 443. (Emphasis supplied.)

Recognizing, however, the potential weapon for delay that *Carroll* presented to existing stations threatened by competition from a potential new license, we cautioned:

"This opinion is not to be construed or applied as a mandate to the Commission to hear and decide the economic effects of every new license grant. It has no such meaning. We hold that, when an existing licensee offers *to prove that the economic effect of another station would be detrimental to the public interest,* the Commission should afford an opportunity for presentation of such proof * * *." *Ibid.* (Emphasis supplied.)

This is the standard we created for the guidance of the Commission.

Appellant's initial allegations of economic injury because of the inability of the covered community to support another radio station were supplemented by additional data furnished at the Commission's request for specific factual data on this point. These data, by way of illustration and not of enumeration, alleged, *inter alia,* that the county where applicant's radio station would be located and where appellant's station operates was in a period of declining economy. However, other data before the Commission showed that population figures, personal income, bank deposits, and retail sales increased and were increasing over significant periods. The Commission record also attested to a rise in appellant's broadcast income from $65,019.00 in 1961 to $80,476.00 in 1963, during

1. Carroll Broadcasting Co. v. Federal Communications Comm'n, 103 U.S.App.D.C. 346, 258 F.2d 440 (1958).

which years appellant's station was operated with a staff of nine employees. Appellant furnished the Commission with estimates of the existence of 400 to 425 businesses which were potential clients in the local radio advertising area, of which 278 were numbered among appellant's accounts for a two-year period. If appellant's figures were accepted by the Commission, there remained some 150 business operations available as potential clients of applicant. The impact of these figures is more significant, however, in view of Folkways' own statement that only 100 to 125 of all of these establishments regularly advertise on station WHBT.

Appellant estimated the available amount of revenue for radio advertising in the Harriman area as being approximately $125,000.00 a year. As indicated heretofore, Folkways Broadcasting revenues for 1963, the year of its highest income shown in the record, was approximately $80,000.00; so there is—by appellant's own figures—some $45,000.00 additional potential revenue for some radio station in Harriman.

Although afforded an opportunity to demonstrate to the Commission which advertisers on appellant's station would transfer their accounts to the applicant's station, appellant declined to "speculate" on this contingency. Certainly, this was a most significant and essential element in measuring the economic impact of the new station upon appellant's future ability to render adequate public service; yet the Commission was furnished no information whatsoever. Appellant, in most general terms, alleged that the establishment of intervenor's station would result in a "significant reduction or destruction of service." In its original petition to deny intervenor's application, appellant Folkways identified four public service programs which might be curtailed. One of these programs is carried only once a year, and the frequency of broadcast of a second is not even recorded. No schedule of curtailment of public service programs was furnished by ap-

pellant, nor was any estimate of the cost of the public service activities to the station furnished, other than an estimate of the sums of money which *might* have been earned if income-producing time had been substituted for the public service announcements. Afforded an opportunity to indicate the nature of the personnel changes or curtailment that appellant would be forced to make because of the economic blight resulting from intervenor's operation, the Commission was merely advised that Folkways' staff would have to be reduced.

At no time did appellant charge that applicant would be unable or unwilling to fulfill its proposed public service programs.

Intervenor, of course, submitted data in support of its application which was intended to justify the issuance of its license, and of course appellant submitted material other than that recounted heretofore in justification of its demand for a hearing on the *Carroll* issue. Obviously, my enumeration of appellant's claims is confined to a broad sampling of Folkways' pleadings intended to illustrate the factual basis for my conclusion that a hearing was not required, or even justified, on the record before the Commission, because, quite simply, appellant made no showing of any potential *injury to the public interest* through loss or degradation of programming service if applicant's license were issued.

Section 309(d), Title 47 U.S.C. permits the Commission to make grants of licenses without hearing, after consideration of the application and all relevant pleadings, upon a finding that there are no *substantial and material questions of fact* outstanding and that the grant is in the public interest. This section of the Communications Act was amended by the Congress in 1960, with the intention of requiring:

"a substantially stronger showing of greater probative value than is now necessary in the case of a post grant protest. The allegation of ultimate conclusionary facts or mere general

allegations on information and belief, supported by general affidavits as is now possible with protests is not sufficient." S.R. 690, 86th Cong., 1st Sess.

In Capitol Broadcasting Co. v. Federal Communications Comm'n, 116 U.S.App. D.C. 370, 324 F.2d 402 (1963), we held that a hearing is not required in the absence of substantial factual allegations which, if true, establish a prima facie case for denial of the application. In the *Southwestern Operating Case, supra,* we stated that:

"Congress intended to vest in the FCC a large discretion to avoid time-consuming hearings in this field whenever possible * * *." 351 F.2d, at 835.

My conclusion upon the record on the *Carroll* issue is succinctly expressed by our observation in KGMO Radio-Television, Inc. v. Federal Communications Commission, 119 U.S.App.D.C. 1, 336 F. 2d 920, 922 (1964), upon a somewhat similar record, that "it is within the Commission's authority to require more information than appellant gave."

The majority opinion holds that the Commission "has not satisfactorily met" appellant's contention that "Crowder's threat to engage in a rate war" presented a factual question requiring a hearing. Applicant filed with the Commission a rate card listing the rates proposed to be charged for advertising on the new radio station if the license were issued. The proposed rates were substantially lower than those being charged for similar time by appellant Folkways. The proposed rates, however, were identical with the rates which Crowder had charged when he had successfully operated Radio Station WLIV in Livingston, Tennessee, and were comparable to those which he, Crowder, had charged when he successfully operated Radio Station WHBT, appellant's present station, at Harriman, Tennessee. To this point, the record certainly supports no charge of rate war. There is no statute or regulation cited to us which prohibits a radio station from charging lower advertising rates than a competitor's. The Supreme Court in *Sanders, supra,* recognized "that the field of broadcasting is one of free competition." 309 U.S., at 474, 60 S.Ct., at 697.

The picture, then, becomes blurred; the issue obscured; the record contaminated; and, I fear, the majority of the panel deceived, by the filing of the counter affidavits described in the majority opinion. Back fence gossip of questionable admissability in a court of law is elevated to the lofty level of "evidence" by its presentation in affidavit form. One affiant departed the other's employment subsequent to the filing of intervenor's license application and entered the employment of appellant. The counter affiant had some business affiliation with F. L. Crowder, the intervenor-applicant, and apparently was to serve—at least by rumor—on the staff of Crowder's station if the license were granted. The affiants label and cross-label each other as unequivocal liars, a conclusion neither arbitrary nor capricious to anyone with a minimal grasp of the obvious. Recognizing the impossibility, as well as the undesirability, of attempting to evaluate the credibility of testimony appearing in conflicting affidavits, the factual situation here, however, disclosed two persons—each obviously motivated by reasons of personal gain—willing to attest or deny the making of oral statements out of the presence of anyone but themselves. The resulting situation is, consequently, one in which, if a hearing issue is created by the affidavits, the Commission would be required, in order to decide in favor of the appellant, to find that the conversations alleged by Willis were in fact true, despite the vehement denials of Scarbrough. The Commission would have to find, further, that the fact of Willis' employment by the appellant after the filing of the application and (apparently) throughout the entire current proceedings did not affect the credibility of his testimony. The members of the Commission would have to find as

310

judges of the fact, that the credibility of one affiant, Willis, was not affected by the termination of his employment by Scarbrough, but conversely that this relationship influenced the reliability of Scarbrough's testimony.

It is inconceivable, of course, that this court would permit the determination of contested issues of material fact by the Commission—or by any administrative agency—without a hearing and solely upon the basis of conflicting affidavits.[2]

I do not believe, however, that the mere utilization of the affidavit form to present conflicting statements *per se* creates automatically a controverted issue of material fact. In my view, the court should, as the Commission did, make a careful analysis of the affidavits and evaluate them in the light of their contents and the possible effect of the testimony of the affiants upon the question to be decided by the Commission. If the affidavits present factual statements of material and relevant evidence reasonably within the affiants' knowledge, they obviously demand that the affiants be exposed to the test of examination and cross-examination to insure to the Commission the reliability of the facts expressed. On the other hand, however, I am completely unwilling to hold that conflicting affidavits, which by any reasonable appraisal can result only in a name calling contest between the affiants when confronted with each other in oral hearing, meet the standard of substance which the Commission may require as constituting "specific allegations of fact" within the meaning of 47 U.S.C., Sec. 309(d) (1).

In dissenting, I conclude that the Commission acted legally and properly, upon the record before it, in finding without a hearing that the grant to the intervenor-applicant of a permit to construct a new radio station would serve the public interest, convenience and necessity.

2. Compare Minor v. Washington Terminal Co., 86 U.S.App.D.C. 71, 180 F.2d 10 (1950); Vale v. Bonnett, 89 U.S.App.D.C. 116, 191 F.2d 334 (1951).