**F. L. CROWDER tr/as Harriman Broadcasting Company, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

Folkways Broadcasting Company, Inc., Intervenor.

No. 21222.

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 8, 1968.

Decided June 20, 1968.

Certiorari Denied Nov. 25, 1968.

See 89 S.Ct. 400.

Mr. Donald E. Bilger, Washington, D. C., for appellant.

Mr. Edward J. Kuhlmann, Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, Gen. Counsel, John H. Conlin, Associate Gen. Counsel, and Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, were on the brief, for appellee.

Mr. Joseph A. Marino, Counsel, Federal Communications Commission, also entered an appearance for appellee.

Mr. John B. Kenkel, Washington, D. C., with whom Messrs, Arthur H. Schroeder and William M. Barnard, Washington, D. C., were on the brief, for intervenor.

Before BAZELON, Chief Judge, EDGERTON, Senior Circuit Judge, and McGOWAN, Circuit Judge.

BAZELON, Chief Judge:

In an earlier appeal we set aside the Federal Communications Commission's grant, made without hearing, of a new standard broadcast station in Harriman, Tennessee, to appellant, F. L. Crowder.[1]

We concluded that the Petition to Deny filed by Intervenor, Folkways Broadcasting Company, present owner of radio station WHBT in Harriman, raised sufficient questions "to require the probing of an evidentiary hearing." [2] The Commission was directed to inquire "whether Crowder has engaged in trafficking of broadcast authorizations, and whether grant of [his] present application would create another opportunity for such trafficking, inconsistent with the public interest." [3] On remand the Commission unanimously rejected the conclusion of the Examiner that Crowder had not trafficked in licenses.[4] Crowder appeals.

These are the salient facts: In 1950 Crowder became the sole owner and general manager of WHBT in Harriman, Tennessee. In February 1955 he began operating WDEH in Sweetwater, Tennessee, which he also owned. However, in June 1955 he engaged media brokers to sell both stations. While they were for sale Crowder moved to Livingston, Tennessee, where in 1956 in partnership with his brother-in-law, Reuben H. McCoin, he started WLIV. At the same time he purchased and personally managed a 7-Up bottling plant there. The WLIV application, as well as renewal applications filed in 1958 and 1961, listed Crowder as "General Manager." This claim was not corrected until Crowder had agreed to sell his interest to McCoin in 1964. By September 1956 Crowder, with Commission assent, sold WDEH for $52,500, with a $22,504 profit, and WHBT for $80,000, with a $61,350 profit. In seeking Commission approval for the transfers, Crowder stated that he desired "to withdraw from the broadcasting business in Harriman at this time. * * *"

1. Folkways Broadcasting Co., Inc. v. FCC, 126 U.S.App.D.C. 123, 375 F.2d 299 (1967).

2. Id. 375 F.2d at 302.

3. Id. at 301. Although Folkways sought Crowder's removal from the air pending the hearing on remand, the Commission granted Crowder a "temporary authority" to operate subject to a showing by Folkways of adverse economic impact. Harriman Broadcasting Co., 7 F.C.C.2d 161, 164, 9 R.R.2d 819, 821–822 (1967). On Folkways' mandamus petition, we held the temporary authority invalid and inconsistent with our remand. Folkways Broadcasting Co., Inc. v. FCC, 126 U.S. App.D.C. 393, 379 F.2d 447 (1967).

4. Harriman Broadcasting Co., 9 F.C.C.2d 731, 10 R.R.2d 981 (1967).

In 1961 Crowder sought a license for a new radio station in Harriman. In response to Folkway's Petition to Deny, Crowder said he sold WHBT and WDEH because of ill health. When queried by the Commission in 1965 about the inconsistency between this and "withdraw[ing] from the broadcast business," Crowder replied that "his health became such that he could no longer continue in the day to day active operation [of the stations] and for that reason both stations were sold. * * * "

On remand Crowder sought to reconcile these representations by explaining that: (1) he sold WHBT and WDEH "upon a doctor's advice"; (2) he never intended to actively manage WLIV and had a private understanding with McCoin to that effect; and (3) that McCoin, without Crowder's assent, mistakenly named him as general manager of WLIV.

On the other hand, Crowder's last commercial manager at WHBT testified that although he worked "pretty closely" with Crowder, Crowder never complained about his alleged ill health. And Harry T. Burn, a lawyer and banker in Rockwood, Tennessee, said that in 1957 Crowder told him that he acquired stations for the purpose of selling them. Burn testified that Crowder was not concerned with local competition, since Crowder said his only interest was to operate the station until it could be sold. Crowder denied ever having represented his business practices to Burn in such a fashion.

In upsetting the Examiner's acceptance of Crowder's explanations,[5] the Commission stated, *inter alia:* (1) that Crowder neither mentioned his illness when he sold the stations, nor subsequently corroborated it at the hearing; (2) that while allegedly ill, Crowder was able to actively manage the 7-Up bottling plant and assist in the operation of WLIV; (3)

and that "in view of his admitted awareness of the significance of the representation and his knowledge of the existence of an agreement to the contrary, it must be concluded that his representation in the 1956 WLIV application was a *deliberate misrepresentation* [Emphasis added]." [6] Moreover, although the Commission found that Crowder failed to meet his burden of proof on trafficking *regardless* of Burn's testimony, it said that Burn's statement "cannot be wholly rejected and is consistent with the objective evidence. * * * " [7]

Although deliberate misrepresentations may, by themselves, justify the denial of a license, Crowder's statements to the Commission did not stand alone. And, on remand, the Commission agreed that the record before this Court on the previous appeal raised a question whether these misrepresentations obscured a pattern of trafficking, or obtaining licenses "for sale rather than service." [8]

Trafficking is condemned because "a government license granted in reliance on an applicant's stated intention to operate should not, instead, be bartered away for profit, i. e., that license should not be granted to persons whose primary intent is to sell them at a profit rather than to operate a station in the public interest." [9] Put otherwise, a broadcast frequency is not a homestead which after five years belongs to the settler for whatever use he desires. Rather it belongs to the public, who through the Commission, award its use to a licensee to operate consistent with the public interest.

The question of trafficking may arise on application to obtain a license or to transfer a license. Section 310(b) of the 1934 Act provides for Commission disapproval of any transfer contrary to

---

5. The Commission, however, was in "substantial agreement with [the Examiner's other] findings of fact." *Id.* at 732–733, 10 R.R.2d at 983.

6. *Id.* at 735, 10 R.R.2d at 986.

7. *Id.* at 738, 10 R.R.2d at 989.

8. Folkways Broadcasting Co., Inc. v. FCC, *supra* note 1, 375 F.2d at 302.

9. WMIE–TV, 11 R.R. 1091, 1098 (1955).

the public interest.[10] Indeed, according to the Commission regulation promulgated in 1962,[11] trafficking is presumed until the contrary is shown, with respect to any transfer of a license held less than three years. And Section 309 of the 1934 Act [12] authorizes denial of a license where the applicant has previously dealt with licenses in a manner which adversely reflects on his character and purpose to operate in the public interest.[13]

■ Service in the public interest presupposes an intent to operate the broadcast facility as represented,[14] for the duration of the license,[15] under Commission supervision,[16] honestly without concealment,[17] and responsive to the broadcasting needs of the community and nation.[18] It does not exclude an intention to profit from the *operation* of a broadcast facility, since this "is as essential to the full development of broadcasting as it is to the development of any industry." [19]

Trafficking on the other hand allows exploitation of a broadcast facility merely to enhance its value as a marketable asset.[20] It rewards commercialization rather than mature programming.[21] It may inflate the price of a station so that only wealthy individuals or businesses will be eligible transferees. And it may lead the new ownership, in an effort to recover its investment, to decrease the quality of the programming while increasing the quantity of the commercials —all at the expense of public audiences.[22]

Appellant does not question the need for guarding against trafficking, but contends that the Commission "never seemed to be able to arrive at a policy which provides a predictable basis or standard to test allegations of trafficking." We disagree.

Trafficking is a familiar concept in broadcast regulation.[23] The Commis-

10. Communications Act of 1934, as amended, 66 Stat. 718, 47 U.S.C. § 310(b) (1964).

11. Section 1.597, 47 CFR 1.597 (1962).

12. Communications Act of 1934, as amended, 66 Stat. 718, 47 U.S.C. § 309(d) (1964).

13. Folkways Broadcasting Co., Inc. v. FCC, *supra* note 1, 375 F.2d at 302.

14. KORD, Inc., 31 F.C.C. 85, 21 R.R. 781 (1961).

15. Application for Voluntary Assignments or Transfers of Control (Notice of proposed rulemaking), FCC 60–1466, 25 F.R. 12898 (1960).

16. KFNF, Inc., 11 F.C.C. 78, 3 R.R. 53 (1945).

17. Lorain Journal Co. v. FCC, 122 U.S. App.D.C. 127, 133, 351 F.2d 824, 830 (1967).

18. Great Lakes Broadcasting Co. v. FCC, 110 U.S.App.D.C. 88, 289 F.2d 754 (1960). The need for local stations to present their audiences with a full and fair picture of current social problems is discussed in the Report of the National Advisory Commission on Civil Disorders (1968). And the failure of local broadcasting to provide such service is discussed in Cox and Johnson Broadcasting in America and the FCC's License Renewal Process: An Oklahoma Case Study (June 1, 1968).

19. Edina Corp., *et al.*, 4 F.C.C.2d 36, 61, 7 R.R.2d 767, 804 (1966).

20. Powell Crosley, Jr., 11 F.C.C. 1, 23, 3 R.R. at 26 (1945).

21. Id. at 22–23, 3 R.R. at 26.

22. The Commission has also pointed out that the sale of a facility may cause "uncertainty on the part of the station personnel and disruption in operation continuity caus[ing] programming deterioration incompatible with broadcasting in the public interest." Application for Voluntary Assignments or Transfers of Control, supra note 15. And the sale may lead to a vacuum in planning occasioned by the departure of management which spent time and money in program development.

23. The expression "trafficking in licenses" was first used at hearings on bills which were ultimately to become the Radio Act of 1927. "It was intended to condemn the activities of those who in the early years of commercial broadcasting, had taken every advantage of the absolute right of a license conferred by the Radio Act of 1912 and had established themselves in a position within the spectrum, from which it was necessary to buy them off." Warner, Transfers of Broadcasting Licenses Under the Communications Act of 1934, 21 B.U.L.Rev. 585, 594–95 (1941).

sion's long standing policy reflects the Congressional concern behind the 1934 Act and its predecessor, the Radio Act of 1927,[24] which sought, *inter alia*, to negative the assertion of any proprietary interest or right by a licensee in a frequency by limiting the duration of a license and providing for Commission approval of transfers.[25] Efforts to prevent "speculat[ion], barter or trade in licenses"[26] are as apparent from the early years of the 1934 Act[27] as they are from the promulgation of the 1962 Rule.[28] The standard has always been clear. The cases on which appellant relies reach different results based on their particular facts, but they do not deny the standard.

We also reject appellant's complaint that the Commission has, in effect, applied its 1962 Rule against trafficking

(Section 1.597) to the 1956 transfer of WDEH within a year of his license award. That transfer was not the sole reason for our remand. Moreover, as we have indicated, the Rule merely reflects a previously established standard. In any case, the period for which the station is held is only one of several relevant considerations.

██ The Commission found Crowder's explanations for the sale of WHBT not credible. It adopted the view that if Crowder had been interested in community broadcast service in Harriman he would have continued to operate WHBT instead of selling it and applying for a new license, and that the sale in less than one year served to show that Crowder's operation of WDEH was for a profitable turnover only. Indeed the evidence of

24. Act of February 23, 1927, 44 Stat.L. 1162–1174.

25. Section 307(d) of the 1934 Act limits the duration of a broadcast license to three years and corresponds to Section 11(A) of the 1927 Act. Section 310(b) prescribed transfer requirements and corresponds to Section 12 of the 1927 Act. For a general discussion of the legislative history of the 1934 Act see Warner, Transfers of Broadcasting Licenses, supra note 24 at 586–600. For an analysis of the policy behind the 1927 Act see Zollman, Recent Federal Legislation Radio Act of 1927, 11 MARQ.L.REV. 121 (1927); Taugher, The Law of Radio Communication with Particular Reference to a Property Right in a Radio Wave Length, 12 MARQ.L.REV. 179 (1928).

Congress refused to limit the price of transfers to the reasonable value of the station's equipment. H.R.REP.No. 9971, 69th Cong.2d Sess. 1162 (1926). Nevertheless the Commission considered price until 1938, Selma Seitz, 7 F.C.C. 315 (1938), and subsequently sought, without success, Congressional guidance for dealing with "inordinately high" amounts paid for transfers. 11th Annual Report, Federal Communications Commission, 1944–45, 13 (1946). The Commission, however, has always been careful to distinguish between this problem and trafficking. Powell Crosley Jr., *supra* note 20.

Under the AVCO rule, an outgrowth of *Powell Crosley*, the Commission also sought to insure that the best qualified

and not necessarily the highest bidder received the license to be transferred. After four years of indifferent success, the Commission abandoned this policy in 1949, 17 U.S.L.WEEK 2574 (June 14, 1949), and Congress, by amending Section 310(b) in 1952, seems to have precluded such action in the future. See Wall and Jacob, Communications Act Amendments, 1952—Clarity or Ambiguity, 41 GEO.L.J. 135, 151–154 (1953). For an overview of the Commission's efforts to deal with the valuation and qualification problems in transfers, see Note, Radio and Television Station Transfers: Adequacy of Supervision Under the Federal Communications Act, 30 IND.L.J. 351 (1955).

26. Applications for Voluntary Assignments or Transfers of Control (Report and Order), 32 F.C.C. 689 (1962).

27. See, for example, Hearst Radio, Inc., 7 F.C.C. 292, 295 (1939); 11th Annual Report, *supra* note 26 ("It is the Commission's policy to disapprove of transfers which obviously represent the activities of a promoter or broker, who is simply acquiring the licenses and trafficking in them."); Powell Crosley, Jr., *supra* note 20; City of Sebring, Fla., 11 F.C.C. 873, 890, 3 R.R. 710, 725 (1947).

28. See, for example, L. B. Wilson, Inc. v. FCC, 129 U.S.App.D.C. ——, 397 F.2d 717 (May 23, 1968); Edina Corp., *supra* note 19; Romac Baton Rouge Corp., 7 F.C.C.2d 564, 9 R.R.2d 1029 (1967); Sunset Broadcast Corp., 5 F.C.C.2d 231, 8 R.R.2d 821 (1966).

**574**

trafficking with respect to WHBT and WDEH was so clear that the Commission deemed it unnecessary "to resolve the trafficking issue as it related to the Livingston station (WLIV)."[29]

We conclude that the Commission action under review was reached on application of proper principles and is amply supported by the record.

Affirmed.

29. Harriman Broadcasting Co., *supra* note 4, 9 F.C.C.2d at 738, 10 R.R.2d at 989.