**KSIG BROADCASTING COMPANY, Inc., Appellant,**

**v.**

**FEDERAL COMMUNICATIONS COMMISSION, Appellee, Barton W. Freeland, Sr., et al., Intervenors.**

**No. 23766.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 9, 1970.

Decided May 11, 1971.

Mr. Arthur Stambler, Washington, D. C., with whom Mr. Lewis H. Goldman, Washington, D.C., was on the brief, for appellant.

Mr. Joseph A. Marino, Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, General Counsel, John H. Conlin, Associate General Counsel, and D. Biard MacGuineas, Counsel, Federal Communications Commission, were on the brief, for appellee. Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, also entered an appearance for appellee.

Mr. Eugene L. Burke, Washington, D. D., entered an appearance for intervenors.

Before BAZELON, Chief Judge, and TAMM and LEVENTHAL, Circuit Judges.

TAMM, Circuit Judge:

This appeal is taken from a decision by the Federal Communications Commission (hereinafter "the Commission") approving the application of Rice Capital Broadcasting Company (hereinafter "Rice Capital") for a construction permit to establish an AM radio station in Crowley, Louisiana. For the reasons set forth below, we affirm the Commission's action.

*History of the Case*

Rice Capital filed its application in October, 1960. In December of that year appellant KSIG Broadcasting Company, Inc. (hereinafter "KSIG") filed with the Commission a motion to deny or designate for hearing Rice Capital's application. KSIG owns the only radio station now operating in Crowley, a town of 15,617, and in Acadia Parish, of which Crowley is the parish seat. Station KSIG broadcasts both during the day and at night.

The applicant and KSIG amended and supplemented the original pleadings on several occasions. Finally, on June 26, 1966, the Commission issued a Memorandum Opinion and Order desig-

nating Rice Capital's application for hearing on the following issues:

1. To determine whether there are adequate revenues to support more than one standard broadcast station in the area proposed to be served by the applicant's proposal without net loss or degradation of standard broadcast service to such area.

2. To determine the basis of the applicant's (a) estimated construction costs, and (b) estimated operating expenses for the first year of operation.

3. To determine the basis for the applicant's estimated revenues for the first year of operation.

4. To determine, in light of the evidence adduced pursuant to the two foregoing issues, whether the applicant is financially qualified.

5. To determine, in light of the evidence adduced pursuant to the foregoing issues, whether a grant of the application would serve the public interest, convenience, and necessity.[1]

(J.A. 6). In accordance with Carroll Broadcasting Co. v. FCC, 103 U.S.App. D.C. 346, 258 F.2d 440 (1958), KSIG was assigned the burden of proving that a second AM radio station in Crowley would cause destruction or degradation of standard broadcast service in the area. On all other issues the applicant was to have the burden of proof and of proceeding with the evidence.

The hearing was held in November and December of 1967, the parties being Rice Capital, KSIG, and the Broadcast Bureau. In his decision the Hearing Examiner found that Rice Capital had demonstrated that it was financially quali-

fied while KSIG had failed to carry its burden of proof on the *Carroll* issue as to whether the establishment of the proposed station in Crowley would weaken service in the area. Consequently, he proposed approval of Rice Capital's application.

KSIG appealed to the Commission's Review Board, filing numerous exceptions to the Examiner's decision. After hearing oral arguments, the Board released its decision in the case. In its opinion the Board discussed both the *Carroll* issue and the financial qualifications issue at some length. Moreover, apparently because it felt the Examiner may not have given sufficient consideration to the evidence which KSIG submitted with regard to the financial qualifications issue, the Board considered this issue de novo and set forth its own findings as to Rice Capital's finances. Ultimately, the Board found in favor of Rice Capital on both issues and therefore upheld the Hearing Examiner's decision.

KSIG next filed an application for review with the Commission. The Commission denied this application without opinion, thereby making the decision of the Review Board binding under section 5(d) (3) of the Communications Act of 1934, 47 U.S.C. § 155(d) (3) (1964). This appeal followed.

KSIG has made several arguments on this appeal and we have given them all full consideration. However, the only issues which we feel merit extended discussion are whether the Review Board's conclusions that the establishment of the proposed station would not result in a degradation of standard radio service in the area and that Rice Capital was financially qualified to con-

---

1. KSIG contends that the Commission should also have included an issue as to whether there was a need for the new station in Crowley. We agree with the Commission that a hearing on this issue was not required. There was no showing that the new station's operations would cause electrical interference on existing stations and there was thus no reason

to balance the need for the new service against the service which might be lost as a result of such interference. The only other loss of radio service to the public which might occur would be that resulting from the new station's competitive impact upon existing stations, and this type of loss was the subject of the first issue designated for hearing.

struct and operate the proposed station were "supported by underlying findings of fact, in turn predicated upon substantial evidence of record." Lorain Journal Co. v. FCC, 122 U.S.App.D.C. 127, 129, 351 F.2d 824, 826 (1965).

*The* Carroll *Issue*

 In order to prevail on the *Carroll* issue, KSIG must show more than mere competitive injury resulting from the entrance of Rice Capital's station into the market. It must also demonstrate that this injury is so substantial that its station's service to the public will be impaired and, further, that the proposed station will be unable to fill the resulting gap in service coverage. As we said in *Carroll:*

> [T]he public is not concerned with whether it gets service from A or from B or from both combined. The public interest is not disturbed if A is destroyed by B, so long as B renders the required service. The public interest is affected when service is affected.

103 U.S.App.D.C. at 350, 258 F.2d at 444. The burden of proving that service will be affected in these circumstances is obviously a difficult one to meet (*Id.*), and we feel it is clear that there is substantial evidence in the record to support the Review Board's determination that this burden was not met here.

To prove that Rice Capital's station would deprive its station of revenues, KSIG attempted to show that the revenue sources available to the new station were limited. It began by arguing that the only area which the Board should consider in resolving the *Car-*

*roll* issue was Acadia Parish, from which KSIG derives most of its revenues.[2] It contended that businesses located outside Acadia Parish would favor their local radio stations with their advertising and that it would therefore be unrealistic to suppose that Rice Capital's station would obtain significant revenues from these businesses. The Review Board found the evidence which KSIG adduced in support of this contention quite inadequate, however. KSIG merely showed that its station and five other Louisiana radio stations derive less than 15 per cent of their broadcast revenues from businesses outside their parishes.[3] The Board thought the evidence regarding the revenues of the five "outside" stations was of little significance because KSIG had not shown "the nature and extent of these stations' respective service areas, the populations enclosed therein, [or] the competitive media within these areas." (J.A. 71.) More importantly, the Board did not feel that the limited revenues which Station KSIG obtained from businesses located outside Acadia Parish could be taken as a standard as to what the new station might accomplish. (J.A. 72.) KSIG apparently had not made extensive efforts to sell advertising to businesses located outside Acadia Parish but within its interference-free broadcast contour. (*Id.*) Moreover, a map submitted into evidence by KSIG indicated that the new station's service contour would cover a large area not presently covered by Station KSIG (J.A. 215),[4] and the Review Board therefore concluded that it would be able to sell advertising in this area whereas Station KSIG would not be able to do so. In summary, then, the Review

---

2. Sales in Acadia Parish represent at least 70 per cent of KSIG's gross sales. Approximately 16 per cent of its gross sales come from national and regional businesses, and the balance of its sales are made in Vermillion, St. Landry, Iberia, and Lafayette Parishes. (J.A. 16.)

3. "KSIG limited its investigation to those two-station communities wherein the stations are the only operating standard broadcast facilities in the parish. These

stations represent approximately 8% of the standard broadcast stations in Louisiana." (J.A. 71.)

4. KSIG contends that the additional area the new station will supposedly serve is lightly populated and that the relatively few businesses located therein will advertise only on their local stations. These were matters which KSIG was required to prove to the Review Board, however, and it failed to do so.

Board found that KSIG had failed to show that the new station could not earn worthwhile revenues from areas outside Acadia Parish. (J.A. 72.)

KSIG next presented evidence with regard to potential revenue sources in Crowley and Acadia Parish. In arguing that the area could not properly support two standard radio stations, KSIG relied heavily on the general economic situation therein. In this regard it noted that the U. S. Departments of Labor and Commerce had classified Acadia Parish as an area of "persistent unemployment" during the years 1965–67. Retail sales in the area and Station KSIG's advertising sales had, however, increased steadily during the relevant period, and the Review Board concluded, in view of these facts, that the area's unemployment problems were not sufficient in themselves to establish that "additional broadcast revenues will not be forthcoming upon the advent of the proposed station." [5] (J.A. 73.)

KSIG also presented arguments as to potential advertising sources in Acadia Parish. It contended that only 440 of the 875 businesses theoretically available to support radio stations in Crowley [6] could be considered potential "regular advertisers." In arriving at this figure, it categorized the available businesses by function and excluded whole categories if less than 5 per cent of the businesses therein advertised regularly over any media. Of the remaining 440 businesses, 194 advertised regularly on Station KSIG, and KSIG argued that the new station would have to rely to a very large extent on these same 194 businesses for its revenues. According to

KSIG, the other 246 businesses could not be considered solid radio advertisers because its station had persistently tried to sell them advertising and had failed. The Review Board thought these calculations were based on illogical assumptions and conclusions. For example, it felt that substantial advertising revenues might be obtained from categories of businesses even though less than 5 per cent of the businesses in these categories would fall within KSIG's definition of "regular advertisers." [7] (J.A. 74–75 n. 31.) The Board also thought Station KSIG's failure to sell advertising in any appreciable amount to 246 potential "regular advertisers" was insufficient in itself to show that the new station could not secure these businesses as advertisers. (J.A. 75.) In this regard the Board noted that KSIG had not shown whether these businesses advertised on stations other than Station KSIG (*Id.*) Finding these and other defects in KSIG's presentation, the Review Board refused to accept its conclusion that the new station would have to rely on businesses which advertised regularly on Station KSIG for a large portion of its revenues; the Board thought several other revenue sources were available.

Finally, KSIG presented estimates of the amount of revenue from its station's advertisers which would be lost to the new station. It thought Station KSIG would lose six advertisers outright because of social, business, and family relationships existing between these advertisers and Rice Capital, and it contended that from 50 per cent to 75 per cent of Station KSIG's remaining major

---

5. The Review Board noted that the Commission's experience has been that "the advent of an additional station in a market has typically been followed by a substantial increase in total broadcast revenues obtained from the market area. See Voice of Middleburg, 3 FCC 2d 512, 513, 7 RR 2d 347, 352 (1966)." (J.A. 72–73 n. 26.)

6. This was the number of businesses within Acadia Parish which, in 1966, were re-

quired to collect the state sales tax. (J.A. 74.)

7. This definition was, of course, somewhat arbitrary itself. KSIG considered as "regular advertisers" those businesses which, regardless of the amount of money spent, advertised on its station four months of the year. It apparently applied this same test to determine which businesses were "regular advertisers" on media other than radio. (J.A. 74–75 n. 31.)

advertisers would divert some of their advertising budget to the new station. The latter estimate was based only on a few conversations Station KSIG's general manager had had with certain unidentified advertisers, and the Review Board refused to accept this estimate because it was not supported by "evidence concerning the intent of its major accounts with respect to division [*sic*] of portions of their advertising support to the new station and, if so, the approximate amount of such diversion." [8] (J. A. 77.) The Board did agree that the advertisers who had ties with Rice Capital's principals would withdraw most of their advertising from KSIG, but it found that these losses would not affect the station's programming because they had already been more than offset by economy measures instituted in anticipation of Rice Capital's entrance into the market. (*Id.*) The Board also noted the Hearing Examiner's finding that Station KSIG could absorb additional revenue losses of some magnitude without having to curtail its public service programming. (J.A. 70.)

On the basis of the findings discussed above, the Review Board concluded that KSIG had failed to carry its burden of proof on the *Carroll* issue. We feel there is substantial evidence in the record to support the Board's findings. We also feel that these findings are sufficient to sustain the Board's decision. In view of the inadequacies in KSIG's evidence regarding the new station's potential revenue sources and its own station's expected advertising losses, we do not believe the Review Board was required to make further findings on such issues as the extent of Station KSIG's public interest programming and the extent to which the new station would be able to replace any of this programming which might be discontinued.[9] The Board concluded that any loss of revenues by Station KSIG which could reasonably be anticipated from the evidence presented would be more than offset by economy measures which the station could adopt and that there was thus no showing that its public interest programming *would* be curtailed as a result of Rice Capital's entrance into the Crowley market. This conclusion is supported by the evidence and determinative of the *Carroll* issue.

*Rice Capital's Financial Qualifications* [10]

Section 308(b) of the Communications Act of 1934, 47 U.S.C. § 308(b) (1964),

---

8. The Review Board obviously felt that KSIG should have attempted to survey its advertisers to determine with some degree of certainty whether and to what extent they would divide their radio advertising budget between its station and the proposed new station. Rice Capital conducted a similar survey to determine whether businesses would advertise on its station, and the Board relied heavily upon this survey in estimating the new station's first-year revenues. (J.A. 66–68.)

9. In Folkways Broadcasting Co. v. FCC, 126 U.S.App.D.C. 123, 375 F.2d 299 (1967), we said that in determining whether an existing licensee was entitled to a hearing on the *Carroll* issue the Commission could not require the licensee to show the specific advertising losses he would suffer and the specific programs he would have to cancel as a result of these losses. (*Id.* at 128–129, 375 F.2d at 304–305.) This does not mean that at a hearing on the *Carroll* issue the li-

censee is not required to present the best available evidence as to the proposed station's potential revenue sources and as to its own expected advertising losses. Here KSIG has not examined to any degree the revenue sources in and around Acadia Parish, and its estimates of future losses are apparently based in large part on one or two conversations which its station's general manager had with unidentified businessmen. In our opinion, "it is within the Commission's authority to require more information [with regard to these issues] than appellant gave." KGMO Radio-Television, Inc. v. FCC, 119 U.S.App.D.C. 1, 3, 336 F.2d 920, 922 (1964).

10. KSIG alleges that the Hearing Examiner wrongfully excluded some exhibits and testimony which it attempted to present as to the new station's financial qualifications and that it therefore did not receive a fair hearing on this issue. The Review Board, apparently at KSIG's request (J.A. 137), considered the finan-

requires Rice Capital to present evidence demonstrating that it is financially qualified to construct and operate a radio station in Crowley. The test which the Commission has formulated to determine whether Rice Capital possesses the requisite finances was set forth in the order designating this case for hearing. There the Commission said:

[A]n applicant [is] financially qualified if it can show that it has sufficient funds to complete construction and to meet all fixed charges and operating expenses during the first year of operation either by proof that adequate funds are available and committed to the proposed station for this purpose without income or by a convincing evidentiary showing that the available and committed funds will be supplemented by sufficient * * * revenues to enable the applicant to discharge its financial obligations during the first year. Ultravision Broadcasting Co., et al., 1 FCC 2d 544, 5 RR 2d 343 (1965).

(J.A. 3.)

Applying this test, the Review Board found the applicant to be financially qualified. It determined that Rice Capital would need $98,653.29 to construct its proposed station and operate it for one year. (J.A. 66.) The company's principals planned to contribute $20,000 toward the construction of the station and they had obtained a $65,000 line of credit. (*Id.*) This left a deficit of $13,653.29. On the basis of a survey of local advertisers made by Rice Capital, the Review Board felt that the Company could rely on a minimum of $21,105.00 in first-year advertising revenues. (J.A. 68 n. 20.) It therefore concluded that Rice Capital would have at least $7,400 more than it needed to cover its construction costs and first year operating expenses. (J.A. 69.)

In contending that this conclusion is incorrect, KSIG raises several points. First, it argues that Rice Capital's evidence with regard to the salaries it would have to pay to attract employees was based on inadequate knowledge of radio broadcasting in the Crowley area. KSIG feels that its salary estimates, which were made by the general manager of its station, are clearly more accurate than Rice Capital's and therefore should have been adopted by the Review Board. Rice Capital's salary estimates were made by Mr. Keim, one of its principals who was, at the time of the hearing, the general manager of a radio station in Coos Bay, Oregon. He had previously been an employee of Station KSIG for over seven years, leaving the station and Crowley in 1960. At the hearing Mr. Keim testified that he had kept abreast of the general wage level for radio station employees in the Crowley area by means of telephone calls and letters to friends in the business who still lived there. (J.A. 233–235.) Because of his continuing contacts with broadcast operations in the Crowley area, the Review Board considered Mr. Keim a knowledgeable witness and accepted his salary estimates. In view of the fact that the Review Board, as an arm of the Commission, is uniquely qualified to pass on such technical questions as the competence of expert witnesses in the field of radio broadcasting (*See, e. g.,* Northeast Broadcasting, Inc. v. FCC, 130 U.S.App.D.C. 278, 286–287, 400 F.2d 749, 757–758 (1968) ), we cannot say that this was error.

KSIG also attacks the Review Board's finding that Rice Capital can record programs in its studio control room during broadcast operations and thus will not have to rent and equip a recording studio. In support of its argument on this issue, KSIG presented

cial qualifications issue de novo, but KSIG alleges that this was not sufficient to correct the errors which it believes were made at the original hearing. We disagree. It is clear from the Review Board's opinion that it considered KSIG's

evidence in great detail, and KSIG does not point to any specific items of evidence which were not considered. In these circumstances we cannot say that KSIG was not accorded a fair hearing on the issue of the adequacy of Rice Capital's finances.

the results of a survey of Louisiana radio stations which indicated that all stations responding to its questionnaire had some form of recording or production studio. The Review Board rejected this evidence, however, because it did not indicate "whether any of the responding stations were first-year operations, or whether the recording or production facilities were furnished subsequent to their first year of operation * * * *" (J.A. 53 n. 8.) Although admitting that Rice Capital's proposal * * * [was] somewhat less than ideal" (*Id.*), the Board thought it was feasible. Considering the Board's expertise, we have no reason to disagree.

Appellant's next contention is that the Review Board erred in failing to consider as items of expense certain rental payments which Rice Capital is required to make for its proposed transmitter site. Since May 29, 1967, Rice Capital has been making payments of $56 per month for this site. The Review Board did include in Rice Capital's costs all payments maturing prior to the close of the hearing, but it felt it would be "unduly stringent" to include payments accruing thereafter. (J.A. 58.) We can understand the Review Board's reluctance to attempt to estimate the amount of rent which would accrue prior to the date Rice Capital commences construction. Rice Capital could reasonably have been expected to defer construction until all appeals concerning its application had been decided, as it apparently has, and this made it virtually impossible for the Board to predict when construction would begin. Moreover, if the Board did attempt to estimate the appeals which would be taken and the rental payments which would accrue while these appeals were being consummated, it would be setting a precedent whereby the appeal process could be used to deplete an applicant's resources and bring his financial qualifications into question. In the future the Commission should perhaps give some thought to developing a method, fair to both parties, of determining which currently accru-

ing costs should be included in an applicant's statement of expenses. Here it is sufficient for us to note that KSIG can expect to have a reserve of at least $7,400 and that rental payments for the transmitter site maturing since the close of the hearing will by no means exhaust this reserve.

KSIG's other contentions, which relate to such matters as telephone and electrical expenses and insurance payments, do not involve substantial amounts. Even if we were to find in favor of KSIG on this issues, there would be more than enough money in Rice Capital's anticipated reserve, even after deducting rental payments for the transmitter site, to cover the additional expenses. Thus, we conclude that there is substantial evidence to support the Board's conclusion that the proposed radio station was financially qualified.

Affirmed.