**GRAYBAR ELECTRIC COMPANY, Incorporated, Appellant,**

v.

**John DOLEY, Margaret S. Doley, C. Archer Smith (Stuart A. Smith), Margaret N. Smith and Bernard J. Carver, co-executors of the estate of Stuart A. Smith, deceased, Ralph T. Baker, C. K. Hutchens and Louis C. Purdey, Appellees.**

**No. 7978.**

United States Court of Appeals
Fourth Circuit.

Argued Nov. 18, 1959.

Decided Dec. 23, 1959.

3. 165 F.Supp. 245, 255–256.

286

Israel Steingold and Meredith A. House, Richmond, Va. (W. Griffith Purcell, Richmond, Va., and Samuel A. Steingold, Norfolk, Va., on brief), for appellant.

G. William White, Jr., Richmond, Va., for appellees John Doley, et al.

Richard W. Hudgins, Warwick, Va. and William McL. Ferguson, Newport News, Va. (Ferguson, Yates & Stephens, Newport News, Va., on brief), for appellees C. K. Hutchens and Ralph T. Baker.

Before HAYNSWORTH and BOREMAN, Circuit Judges, and CHESNUT, District Judge.

CHESNUT, District Judge.

The principal question presented by the appeal in this case is whether a single creditor of a corporation which has gone through bankruptcy, has standing, after the discharge of the Trustee, to bring suit on a contract of stockholders to make loans of money to the corporation, in which the creditor was not named as beneficiary and when the creditor has participated in the bankruptcy proceedings by filing his claim therein and receiving a dividend thereon, but has not at any time filed a request therein to require the Trustee in bankruptcy to bring such a suit for the benefit of all creditors.

On August 14, 1957 Graybar Electric Company, Incorporated, a New York corporation, filed suit in the District Court of the United States for the Eastern District of Virginia, against seven individual defendants in this case, constituting the original stockholders (some of whom were also officers and directors) of the Eastern Broadcasting Corp., a Virginia corporation, to recover a balance of indebtedness due from Eastern to Graybar in the amount of $102,430.50, for television equipment sold and delivered. The basis for the suit was alleged to be a written agreement dated January 24, 1952 of the seven stockholders with each other to advance by loans to be repaid from earnings of the corporation, sums of money in varying amounts by each, in the total amount of about $275,000, if demanded by Eastern for its necessary financing. It was further alleged that the reason for the stockholders' agreement was the anticipated application by Eastern to the Federal Communications Commission for a permit to construct a television station and thereafter to obtain a license from the Commission for its operation. It was further alleged that, in accordance with arrangements, Eastern filed with its application a copy of the stockholders' agreement and individual financial statements from the several stockholders as to their respective individual financial ability; and that in due course the Commission granted the permit for construction and the station bought the necessary television equipment from Graybar and started and continued operations for some time, but the operations were not profitable and the station lost substantially large sums of money, and on October 28, 1955 three creditors filed an involuntary petition in bankruptcy against Eastern, and that in due course of bankruptcy administration the assets of the corporation were liquidated and dividends paid to secured and unsecured creditors, resulting in an unpaid balance due to Graybar in the amount mentioned.

The complaint further alleged that the liability of the seven defendants was predicated on their agreement of 1952 which was still unperformed and that those defendants who were officers and directors of the corporation had negligently failed to require the stockholders

to pay their respective amounts to the corporation. It also alleged that the defendants were guilty of fraudulent conduct in making misrepresentations directly or indirectly to Graybar with respect to their agreement. But this charge of fraud was abandoned and need not be further considered.

Six of the defendants (one not having been summoned) separately answered the complaint denying generally any liability to the plaintiffs and some of them including more specifically defenses based on limitations or laches, estoppel, waiver, and contending that the stockholders' agreement was not intended to and did not authorize any suit against them by Graybar, and that no demand had ever been made upon them by the corporation or any authorized representative of the corporation to make advances by way of loans.

The parties prayed a jury trial; a jury was impanelled; all evidence which the plaintiff desired to offer was received and considered by the District Judge, the defendants not being called upon to offer any testimony on their behalf. At the conclusion of the taking of the evidence the District Judge announced that in his view of the case the question submitted was entirely one of law with no facts to be determined by the jury and thereupon the jury was discharged without objection. The plaintiff and the defendants respectively moved for a summary judgment. After consideration the District Judge wrote an opinion reviewing in substance the evidence that had been introduced by the plaintiff and concluded that whatever rights the plaintiff might originally have had under the stockholders' agreement had been lost by its laches and estoppel. Thereupon summary judgment was entered in favor of the defendants, from which this appeal has resulted.

While the record is an extensive one including many exhibits and much testimony thought by the parties to have significant relevance to the defenses of laches and estoppel, we find it unnecessary to discuss those matters in detail because in the view we take of the case the plaintiff, not a party to the agreement and not named as a beneficiary and not intended by the parties to be a beneficiary from the nature of the agreement, did not have the standing to bring directly a suit on that contract against the defendants who were the only parties thereto; and in any event treating the agreement as a possible asset of the corporation, it could be realized upon only by Eastern which was the direct beneficiary or by its Trustee in bankruptcy as its legal representative.

We think it sufficient to state succinctly the relevant and controlling facts appearing in the record which are not disputed. In 1951 Eastern was operating a radio broadcasting station at Newport News, Virginia. It had net assets of about $56,500. It desired to broaden its activities by adding television to radio. To do this it was necessary to apply to the Federal Communications Commission for a permit to equip the station for television. This application was made on April 8, 1952. In it Eastern specified that R.C.A. equipment would be used but later the kind of equipment as allowed by the Commission was changed to F.T.L. The permit to construct the television station was first issued by the Commission on February 4, 1953 and modified July 22, 1953. On June 15, 1953 Graybar sold F.T.L. equipment to Eastern for $135,529 under a conventional conditional contract of sale, to be paid for in installments, the last maturing November 15, 1956. The station began operations in October 1953. On November 11, 1953 O'Malley, the credit representative of Graybar, wrote a letter to Doley, President of Eastern, saying that in selling the television equipment he was aware of and relied on the financial statement including the stockholders' agreement, a copy of which had been filed with the Federal Communications Commission, and expressed the hope that further financing could be successfully accomplished by Eastern. There was apparently no reply to this letter and O'Malley made no demand in it for action by Eastern. Presumably after further negotiations with Eastern

the latter, on December 31, 1953, made a chattel mortgage of its radio equipment at Newport News to Graybar conditioned on the release of the mortgage upon payment of $140,121 then due to Graybar.

On October 28, 1955 three creditors filed an involuntary petition in bankruptcy against Eastern. In due course adjudication followed and a Trustee was appointed. The assets of Eastern were collected and distributed to its secured and unsecured creditors. Graybar filed its claim as a secured creditor under the chattel mortgage and conditional sale contract in the amount of $164,090.94. By agreement the whole of the assets of the radio and broadcasting station were sold free of the lien held by Graybar and the net proceeds of the sale, subject to its liens, were paid to Graybar. In addition there was a dividend to all creditors in consequence of which Graybar received dividends of $35,097.55, leaving an unpaid balance of about $102,000. The unpaid claims of other creditors aggregated about $80,000. When Graybar filed its claim as a secured creditor it made no mention of holding any security other than the lien already mentioned. The Trustee's final account having been filed, he was in due course discharged on June 8, 1957. During the whole course of the bankruptcy proceedings Graybar made no demand or request upon the Trustee and filed no petition with the bankruptcy court to require the Trustee to take any action to collect further assets of the bankrupt estate under the stockholders' agreement. Eastern was dissolved under Virginia law on June 3, 1958.

We come now to a more particular consideration of the legal points on which the plaintiff's claim is based, that is, the stockholders' agreement of January 24, 1952, and the Virginia statute which the plaintiff contends permits its suit against the defendants.

The primary question is whether the plaintiff, not a party to the contract and not named therein as a beneficiary, can sue upon the contract. It relies up-on the Virginia statute referred to and shortly to be quoted. As the jurisdiction of the court in this case was based on diversity of citizenship we must be governed by the terms of the statute as construed and applied by the Virginia decisions; but it will be well to first note the gradual development of the law with respect to suits on a contract by a *third party*.

By the early English decisions, with few exceptions, a third party could not sue upon such a contract. Gradually, however, this rule became relaxed under particular conditions by American decisions and in some States the matter was regulated by statute. See generally Williston on Contracts, Vol. 2, Rev.Ed. ss. 347, 360, 378 and 402; 17 C.J.S. Contracts § 519; Corbin on Contracts, Vol. 4, s. 772 et seq. The general state of the law in 1912 was well expressed by Mr. Justice Lamar for the Supreme Court in German Alliance Ins. Co. v. Home Water Supply Co., 1912, 226 U.S. 220, 33 S.Ct. 32, 35, 57 L.Ed. 195, as follows:

> "In many jurisdictions a third person may now sue for the breach of a contract made for his benefit. The rule as to when this can be done varies in the different States. In some he must be the sole beneficiary. In others it must appear that one of the parties owed him a debt or duty, creating the privity, necessary to enable him to hold the promisor liable. Others make further conditions. But even where the right is most liberally granted it is recognized as an exception to the general principle, which proceeds on the legal and natural presumption, that a contract is only intended for the benefit of those who made it. Before a stranger can avail himself of the exceptional privilege of suing for a breach of an agreement, to which he is not a party, he must, at least *show that it was intended for his direct benefit*." (Italics supplied.)

And this was followed in an opinion of the Supreme Court by Mr. Justice

Holmes in Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290, decided in 1927.

The Virginia statute as contained in the Virginia Code of 1887, § 2415, allowed a third party to sue upon a contract only where it appeared that it was *solely for his benefit*. In 1897, applying the statute as so worded the Virginia Court in Newberry Land Co. v. Newberry, 95 Va. 119, 27 S.E. 899, 900, said, after pointing out that at common law a third person to a contract could not sue upon it, that the effect of the statute prohibited the suit "unless he is plainly designated by the instrument as the beneficiary, and the covenant or promise is made for his sole benefit". The statute is further liberalized by amendment and as it appeared in the Code of 1919, § 5143, and now appears in the Code of 1950, § 55–22, reads as follows:

"When a person not a party * * may take or sue under instrument. * * *; and if a covenant or promise be made *for the benefit,* in whole or in part, *of a person with whom it is not made,* or with whom it is made jointly with others, such person, whether named in the instrument or not, may maintain in his own name any action thereon which he might maintain in case it had been made with him only and the consideration had moved from him to the party making such covenant or promise. In such action the covenantor or promisor shall be permitted to make all defenses he may have, not only against the covenantee or promisee, but against such beneficiary as well." (Italics supplied.)

■ ■ It is clear from the wording of the statute that it limits the right of a third person to sue upon a contract to which he is not a party to a case where it can be shown that the contract was made for his benefit. We think Graybar does not meet this test. It will be noted that a third person may now sue on a contract to which he is not a party though he is not named therein and he is not solely benefited thereby; but only if the contract was made for his benefit. The full text of the contract is set out in the margin.[1]

1. "This Agreement made this 24th day of January 1952, by and between John Doley and Margaret S. Doley, parties of the first part, C. Archer Smith, party of the second part, Stuart A. Smith, party of the third part, Ralph T. Baker, party of the fourth part, C. K. Hutchens, party of the fifth part, and L. C. Purdey, party of the sixth part.

"Witnesseth: That Whereas the above named parties are all of the stockholders of the Eastern Broadcasting Corporation; and Whereas the said Eastern Broadcasting Corporation, pursuant to action of its Board of Directors, contemplates the filing of an application with the Federal Communications Commission for a construction permit and license to construct and operate a television broadcasting station in or about the City of Newport News, Virginia; and

"Whereas in connection with the filing of said application it is necessary that the said Eastern Broadcasting Corporation show its financial ability to follow through on the construction and operation of said television broadcasting station, and it is the desire of the parties hereto to insure such financial capacity for the Eastern Broadcasting Corporation.

"Now, Therefore, In Consideration of the premises, the mutual agreements herein contained, and the sum of One Dollar ($1.00) by each of the parties hereto paid to the other, it is mutually agreed by and between the parties hereto as follows:

"1. Should the Federal Communications Commission grant to the Eastern Broadcasting Corporation a construction permit and a license for the construction and operation of a television broadcasting station as above set forth, the parties hereto do hereby undertake and agree to make available to said Eastern Broadcasting Corporation sufficient sums of money in cash to meet all requirements of cash commitments which may be needed either to meet the actual cost of such construction and operation or to meet the minimum requirements specified by the Federal Communications Commission, in the manner, upon the terms, and in the respective amounts as hereinafter set forth.

"2. The parties hereto agree that they individually will make available to Eastern Broadcasting Corporation in cash such sums as may by the Board of Directors of said Eastern Broadcasting Corpora-

290

The substance of the contract dated January 24, 1952 is a signed and sealed writing between all seven stockholders of Eastern Broadcasting Corp., that upon demand by the Board of Directors of Eastern they would make advances by way of loans to the corporation in varying specified amounts from each (severally but not jointly) if required to furnish funds sufficient for the construction and operation of a television broadcasting station. The agreement recited that it was the purpose of Eastern to apply to the Federal Communications Commission for a permit to construct and operate a television broadcasting station at Newport News, Virginia, and that it would be required to furnish with the application a statement showing the financial ability of the applicant. The precise promise made by the several stockholders was "to make available to said Eastern Broadcasting Corporation sufficient sums of money in cash to meet all requirements of cash commitments which may be needed either to meet the actual cost of such construction and operation or to meet the minimum requirements specified by the Federal Communications Commission, in the manner, upon the terms, and in the respective amounts as hereinafter set forth."

The precise question is whether this agreement was made for the benefit of Graybar. The District Judge in dismissing the jury found that Graybar had introduced no evidence extrinsic to the agreement to show that it was made for the benefit of Graybar, one of many creditors of Eastern, and we find no evidence in the record to the contrary. And when we turn to the wording of the contract itself we find no intrinsic evidence therein that it was made for the benefit of Graybar. The contract was made January 24, 1952. The application to the Federal Communications Commission was not made until April 8, 1952. It first specified that the television equipment to be used was R.C.A., a different make from that subsequently furnished by Graybar; and we find no mention of Graybar in the proceedings before the Commission, and although it appears the kind of equipment was changed from R. C.A. to F.T.L., there is no reference to Graybar as the vendor of the equipment.

We think it clearly appears in the agreement itself that the only direct beneficiary of the contract was Eastern and inferentially through Eastern the stockholders themselves who hoped to profit from Eastern's financial success in the operation of the television station. Graybar argues that we should find that it was the intended beneficiary from the filing with the Commission of a copy of the contract and a statement showing the financial ability of the stockholders; but we think not.

tion be required of them, not in excess of the amounts in this paragraph set opposite their names, as follows:

(A) John Doley and Margaret S. Doley .......$ 35,000.00
(B) C. Archer Smith ...... 100,000.00
(C) Stuart A. Smith ....... 35,000.00
(D) Ralph T. Baker ....... 5,000.00
(E) C. K. Hutchens ....... 100,000.00
(F) L. C. Purdey .......... N o n e

"3. It is agreed by and between the parties hereto that the amounts of money advanced pursuant to this agreement shall be in the form of a loan to said Corporation, which loan shall bear interest at the rate of four percent (4%) per annum, which shall be payable out of operating revenue of said corporation. It is further agreed that not less than seventy-five percent (75%) of the net operating profits of said corporation shall be applied to the payment of the principal of said loans, and that such payments shall be made annually, or at such other periods as may be mutually agreed upon, until the principal amount of said loans has been paid in full. It is further agreed that such payments as may be made on the principal shall be paid to the respective parties hereto in proportion to the actual amount advanced by them pursuant to this agreement.

"Witness the following signatures and seals.

"/s/ John Doley (Seal)
/s/ Margaret S. Doley (Seal)
/s/ C. Archer Smith (Seal)
/s/ Stuart A. Smith (Seal)
/s/ Ralph T. Baker (Seal)
/s/ C. K. Hutchens (Seal)
/s/ Louis C. Purdey (Seal)"

The necessity for the nature and contents of the application to the Federal Communications Commission is found in section 319(a) of title 47 U.S.C.A., the full text of which is stated in the margin.[2] We think it apparent that the purpose of the requirement is to protect the interests of the public. This seems to be the expressed judicial view. Federal Communications Commission v. Sanders Bros., 1940, 309 U.S. 470, 475, 60 S.Ct. 693, 84 L.Ed. 869; Scripps-Howard Radio v. Federal Communications Commission, 1951, 89 U.S.App.D.C. 13, 189 F.2d 677, certiorari denied 342 U.S. 830, 72 S.Ct. 55, 96 L.Ed. 628; Saginaw Broadcasting Co. v. Federal Communications Commission, 1938, 68 App.D.C. 282, 96 F.2d 554, certiorari denied Gross v. Saginaw B. Co., 305 U.S. 613, 59 S.Ct. 72, 83 L.Ed. 391. And this seems to be the administrative understanding in the practice of the Commission, as explained in the testimony of Miss Morris, Secretary to the Commission. There is a scarcity of frequencies available for television broadcasting and when the Commissioners assign a particular frequency to a particular station it is necessarily exclusive as to that particular frequency for that particular locality. It is therefore particularly in the public interest that an applicant for such a permit or license should be required to show financial ability to utilize the particular frequency for public benefit. We find nothing in the Act to warrant the conclusion that the financial statement so supplied was for the benefit of creditors but only for the information of the Commission in its determination as to whether the permit or license should be granted. With respect to the interest of creditors we note that the Secretary when asked by counsel "You are not running a credit bureau for the manufacturers of television?", replied "I would not like to hear our jurisdiction defined in that way". We think it clear on the face of the contract that Eastern was the direct beneficiary and the agreement was potentially an asset of the corporation which may incidentally have been of benefit to creditors generally; but this is quite different from holding that the contract was for the benefit of Graybar, only one of several creditors.

We have examined all the Virginia cases dealing with the particular statute that were referred to by counsel, and others which we have noted in the annotation in Michie's Code of Virginia (1950) § 55–22 for the particular purpose of finding the principles of construction applied to the statute by the Virginia Court, and as illustrated by the facts of particular cases. It has been decided that the statute is to be considered a remedial one and to be liberally interpreted and applied; but in our opinion we find no illustrative case that would indicate to us that the Virginia Court would on the facts of the instant case find that the stockholders' contract in suit would be sufficient intrinsically to permit Graybar to sue on it. Montague Mfg. Co. v. Homes Corp., 1925, 142 Va. 301, 128 S.E. 447, has been particularly stressed by counsel for Graybar and we may take it as an example of the kind of

---

**2.** "§ 319.  Construction permits; licenses for operation.

"(a) No license shall be issued under the authority of this chapter for the operation of any station the construction of which is begun or is continued after this chapter takes effect, unless a permit for its construction has been granted by the Commission. The application for a construction permit shall set forth such facts as the Commission by regulation may prescibe as to the citizenship, character, and the financial, technical, and other ability of the applicant to construct and operate the station, the ownership and location of the proposed station and of the station or stations with which it is proposed to communicate, the frequencies desired to be used, the hours of the day or other periods of time during which it is proposed to operate the station, the purpose for which the station is to be used, the type of transmitting apparatus to be used, the power to be used, the date upon which the station is expected to be completed and in operation, and such other information as the Commission may require. Such application shall be signed by the applicant under oath or affirmation."

contract on which a third person may sue under the Virginia statute. In that case a firm of debtors made an agreement with one Arthur to pay all indebtedness of the firm and turned over to him all its assets on his promise to pay the creditors. The performance of his promise was guaranteed by Homes Corporation. Arthur became bankrupt and did not pay the creditors, and they were allowed to sue on the guaranty; but it will be noted that the basic agreement clearly and expressly showed that it was for the benefit of the creditors. The instant situation does not measure up to that. Other illustrative cases where a third person was permitted to sue on a contract and where the intention to benefit the third person was found, but which we find different in kind from the instant case, are Horney v. Mason, 1945, 184 Va. 253, 35 S.E.2d 78; Indemnity Ins. Co. v. Davis' Adm'r, 1928, 150 Va. 778, 143 S.E. 328.

■ Even if it could be held under the Virginia statute and decisions that the stockholders' contract was for the benefit of creditors, there is another and more controlling reason why the suit by Graybar alone could not be maintained. Treating the contract as an asset of Eastern, upon the latter's bankruptcy the title to the contract and the right to realize upon it passed to the bankruptcy Trustee under the provisions of 11 U.S. C.A. § 110, sub. a(6), reading:

"The trustee of an estate of a bankrupt and his successor or successors, if any, upon his or their appointment and qualification, shall in turn be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition initiating a proceeding under this title, except insofar as it is to property which is held to be exempt, to all of the following kinds of property wherever located.

\* \* \* (6) rights of action arising upon contracts, \* \* \*."

See also Collier on Bankruptcy, 14th Ed. Vol. 4, par. 70.29; Harrigan v. Bergdoll, 1926, 270 U.S. 560, 564, 46 S.Ct. 413, 70 L.Ed. 733 and Gochenour v. Cleveland

Terminals Bldg. Co., 6 Cir., 1941, 118 F.2d 89.

As previously stated, bankruptcy proceedings continued from October 28, 1955 to June 8, 1957, when the Trustee was discharged after filing his final accounts and dividend distribution to creditors. During this period Graybar actively participated in the proceedings agreeing to the sale of the bankrupt's property free of its liens, receiving the proceeds of sale derived therefrom and later receiving also a dividend to unsecured creditors. During all this time Graybar made no demand upon the Trustee to bring suit upon the contract for the recovery of the assets of the corporation and made no application to the court to require the Trustee to do so. We therefore hold that Graybar as one of the several creditors of the corporation, has no standing in court to now bring suit on the contract.

If the agreement should be held to constitute an asset of the corporation available pro rata for all unsecured creditors, it can be realized upon only by the present or successor Trustee. The Bankruptcy Act in section 2 as amended in 1952, (11 U.S.C.A. § 11, sub. a(8)) provides for a re-opening of an estate, "for cause shown". If the creditors of Eastern wish to pursue any further remedy, they must apply to the District Court for the Eastern District of Virginia where the bankruptcy case was pending, for an order to re-open the case. This would, of course, be a matter for the determination of the District Court, as to which we express no opinion.

■ As to the feature of Graybar's complaint charging the defendants, or some of them, as Directors of Eastern, with negligence in not requiring the stockholders to comply with their agreement, it is also clear that such a complaint cannot be litigated in the instant case. If the charge can be successfully established, any recovery thereon would also be an asset of the corporation enforceable only by the Trustee in bankruptcy or his successor. In comparable situations in corporate receiverships in

equity (though not in bankruptcy) the Virginia cases are to the same effect. Saunders v. Bank, 1912, 113 Va. 656, 75 S.E. 94, and Murrell v. Traders' & Truckers' Bank, 1912, 113 Va. 665, 75 S.E. 97.

For the reasons herein stated we conclude that the entry of judgment for the defendants was correct, and therefore the judgment of the District Court must be

Affirmed.