**LAS VEGAS VALLEY BROADCASTING CO., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**Western Communications, Inc., Intervenor.**

**WESTERN COMMUNICATIONS, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**Las Vegas Valley Broadcasting Co., Intervenor.**

**Nos. 76–2104, 76–2124.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 22, 1978.

Decided Oct. 26, 1978.

Rehearing Denied Dec. 29, 1978.

J. Skelly Wright, Chief Judge, concurred in part and dissented in part and filed opinion.

Edgar F. Czarra, Jr., Washington, D. C., with whom Michael S. Horne, Joseph Volpe, III and Douglas E. Winter, Washington, D. C., were on the brief for appellant in No. 76–2124 and intervenor in No. 76–2104.

Robert T. Murphy, Washington, D. C., for appellant in No. 76–2104. Edward P. Morgan and Joseph M. Morrissey, Washington, D. C., were on the brief, for appellant in No. 76–2104 and intervenor in No. 76–2124.

C. Grey Pash, Jr., Counsel, F. C. C., Washington, D. C., with whom Lawrence W. Secrest, III, Acting Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and Thomas R. King, Jr., Counsel, F. C. C., Washington, D. C., were on the brief, for appellee. Also Werner K. Hartenberger and Raymond L. Strassburger, Attys., F. C. C., Washington, D. C., entered appearances for appellee.

Before WRIGHT, Chief Judge, and BAZELON and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge BAZELON.

Opinion filed by Chief Judge J. SKELLY WRIGHT, concurring in part and dissenting in part.

BAZELON, Circuit Judge:

The Federal Communications Commission (FCC) denied applications of appellants in these cases for a television broadcast license for Channel 3 in Las Vegas, Nevada.[1] In No. 76–2124, Western Communications, Inc. (Western), the incumbent licensee at KORK–TV, appeals the Commission's finding that fraudulent billing practices and misrepresentation required denial of its renewal application; in No. 76–2104, Las Vegas Valley Broadcasting Co. (Valley) disputes the Commission's conclusion that it was not financially qualified for the license. We affirm the FCC's order as to Western, but remand for further proceedings as to Valley's application.

## I.  WESTERN

In the renewal proceeding, the Commission reviewed Western's apparent practice of "clipping" parts of network broadcasts to insert local advertising, thereby violating both FCC rules and the station's affiliation contract with the National Broadcasting Co. (NBC).[2]  Although Western insists that it

---

1. The mutually exclusive applications were first set for hearing in 1972. *Western Communications, Inc.,* 35 F.C.C.2d 517 (1972); *Western Communications, Inc.,* 37 F.C.C.2d 266 (1972).

2. The NBC contract established that KORK would not "without NBC's prior written authorization make any deletions from or additions to any program furnished to you hereunder.

. . . ." *Western Communications, Inc.,* 59 F.C.C.2d 1463, 1465 (1976) [hereinafter cited as Initial Decision]. Section 73.1205 of the Commission's rules, 47 C.F.R. § 73.1205 (1977), provides:

No licensee . . . shall knowingly issue . . . any bill, invoice, affidavit or other document which contains false information . . . or which misrepresents the quantity of advertising actually broadcast (number or

only clipped "clutter," described as network promotional announcements, the administrative law judge (ALJ) found that network commercials were frequently clipped, and that the licensee submitted inaccurate reports to the network on its practices.[3] As a result, NBC paid KORK for advertisements that either did not appear at all, or appeared only in part. The Commission affirmed the ALJ's initial decision,[4] finding a "gross disregard of the Commission's fraudulent billing rules, which reflects adversely on Western's qualifications to be a Commission licensee."[5]

The misrepresentation issue involves KORK's answers to four Commission inquiries in 1970–71, about the station's policy on inserting local commercials or other announcements in network programs.[6] KORK replied that any deletions of network material were due to error by individual personnel, not station policy. The ALJ thought the responses "form[ed] a pattern of attempting to mislead the Commission as to the station's commercial practices,"[7] and that KORK "as a matter of policy and practice was scheduling more local commercials than could be accommodated in the authorized break time."[8] The FCC again agreed, calling the licensee's responses to Commission inquiries "false, misleading and evasive," and "clearly designed to conceal its operating practices."[9]

Western claims that the Commission's denial of its renewal application (A) was not based on substantial evidence, (B) neglected valid defenses presented on Western's behalf, and (C) constituted an unjustifiably harsh sanction for conduct not clearly prohibited under prior Commission policy.

## A. Substantial Evidence

■ On the clipping issue, the factual record supports the Commission's conclusion that KORK substituted local material for network broadcasts.[10] The FCC Broadcast Bureau compared the operating logs of KORK and the Los Angeles NBC station for fifteen programs between October 4, 1970 and May 7, 1971, and concluded that KORK clipped at least part of 21 network commercials.[11] A similar study by Valley of a 28-week period indicated that approximately 250 commercials were clipped.[12] Although such log comparisons are subject to human error in record-keeping, a clear pattern emerges here. Moreover, KORK's own review of the period between 1968 and 1971 showed approximately 800 clipped network commercials,[13] and the station paid NBC $7,763.02 for advertisements that it may not have carried.[14]

■ There is also substantial evidence in the record that Western's responses to Commission inquiries involved misrepresentations and lacked candor. The FCC opinion carefully traces Western's inaccurate characterizations of particular incidents and general practices.[15] Western would defend

length of advertising messages) or . . . the time of day at which it was broadcast . . . .

**3.** The number of commercials actually clipped has not been established, but there is ample evidence in the record that the practice was widespread at KORK. *See* text accompanying notes 10–14 *infra*.

**4.** *Western Communications, Inc.,* 59 F.C.C.2d 1441 (1976) [hereinafter cited as Final Decision].

**5.** Id. at 1444 (citation omitted).

**6.** The FCC inquiries were prompted by viewer complaints about commercials disrupting telecasts of the World Series and various entertainment shows. J.A. 857–881 (No. 76–2124).

**7.** Initial Decision, *supra* note 2, at 1474.

**8.** *Id.*

**9.** Final Decision, *supra* note 4, at 1449.

**10.** Our standard of review under 47 U.S.C. § 402 (1970) requires that the Commission's findings be supported by substantial evidence.

**11.** Initial Decision, *supra* note 2, at 1467.

**12.** *Id.*

**13.** J.A. 1310–39 (No. 76–2124).

**14.** Final Decision, *supra* note 4, at 1443 n.7.

**15.** *Id.* at 1446–49.

its responses on the ground that the FCC inquiries were imprecise, asking "as to all the circumstances" surrounding the insertion of "advertising in network programs . . . in such a manner as to affect the program content."[16] Whatever ambiguity may have been present in the Commission's language, the central thrust of the questions was clear, and we see no basis here for disputing the Commission's conclusion that Western's responses contained both falsehoods and evasions.

## B. *Defenses*

■ Western asserts that non-renewal of its license was not justified because there was no proof that the licensee, Donald Reynolds, knew of KORK's clipping practices. The record shows that two station managers appointed by Reynolds, both of whom were officers and directors of Western, knew of the clipping. It would be irrational to permit Reynolds, who holds several other broadcast licenses, to avoid responsibility for the acts of his officers. Such a course would both encourage lax station oversight by licensees and set "a different standard of conduct for a multiple or absentee owner than for a local owner."[17]

■ Drawing an analogy to fairness problems resulting from *ex parte* contacts with decision makers, Western also suggests that "leaks" to the press after the FCC hearing prejudiced its case and denied it due process. Western contends that the leaks tended to "lock-in" the FCC's tentative decision and disrupt the deliberative process.[18] Although premature revelation of a decision is unfortunate, we do not see how such an event relates to the *ex parte* question, nor can we identify, on this rec-

ord, any infringement of due process resulting from such disclosure.

## C. *The Penalty*

■ Western claims the denial of renewal was unjust because the licensee had no notice that clipping would constitute fraudulent billing, or that it could result in non-renewal. This argument is . groundless. Concern over the regularity of a licensee's financial practices derives from the Communications Act's requirement that the FCC consider an applicant's "character,"[19] and from the "public. interest" standard for broadcast regulation.[20] Since 1962, the Commission has issued several statements announcing a strong policy against fraudulent billing.[21] Indeed, a 1970 statement specifically noted as fraudulent any bill misrepresenting the length of the commercial as broadcast,[22] and an FCC rule adopted in 1965 prohibits billing "which misrepresents the quantity of advertising actually broadcast."[23] Even without specific Commission prohibition of clipping, the practice would appear manifestly fraudulent. But in this situation, KORK's contract with the network, the Commission's 1970 statement, and the Commission's rule all clearly barred clipping.

■■ Finally, Western argues that even if the Commission's findings of fraudulent billing practices were accurate, nonrenewal of the broadcast license was a disproportionately severe sanction, especially in light of less drastic penalties imposed by the Commission in arguably analogous cases. Western's argument reflects a misapprehension of the nature of a broadcast license. "[A] broadcast frequency is not a homestead which after five years belongs to the

16. *Id.* at 1447.

17. *Id.* at 1450.

18. Brief for Petitioner Western Communications, Inc., at 67.

19. 47 U.S.C. §§ 308(b), 319(a) (1970).

20. 47 U.S.C. § 309(a) (1970).

21. *E. g.*, Applicability of Fraudulent Billing Rule, 1 F.C.C.2d 1075 (1965); Fraudulent Bill-

ing Practices, 23 F.C.C.2d 70, 72 (1970); Renewal or Revocation Hearing Proceedings in Future Fraudulent Billing Cases, 38 F.C.C.2d 1051 (1972); Fraudulent Billing Practices, 53 F.C.C.2d 900 (1975).

22. 23 F.C.C.2d 70, 72 (1970).

23. 47 C.F.R. § 73.1205 (1977).

settler . . .. Rather it belongs to the public . . . ."[24] Retention of a license hinges on a demonstration that past service has been in the public interest and that future service will likely be superior to that offered by competing applicants.[25] The Commission has held, and the courts affirmed, that misrepresentation of even immaterial facts is a valid basis for nonrenewal.[26] In addition, courts ordinarily accord the Commission particular discretion in fashioning remedies to maximize compliance with Commission policy.[27]

## II. VALLEY

The Commission found that Valley "established its qualifications to be a Commission licensee in all respects except its financial qualifications."[28] FCC practice, based on general statutory terms,[29] requires that license applicants have sufficient funds—in the form of paid-in capital, anticipated revenues, and loans—to cover costs through the first period of operation.[30] This requirement can be justified as insuring that scarce broadcast frequencies will be assigned to applicants who can maintain service on them,[31] and as excluding shoestring

operations that might be more likely to resort to unethical or fraudulent practices to stay afloat.

Determining an applicant's financial qualifications, however, is an imprecise enterprise. For example, the Commission must gauge anticipated revenues of a prospective licensee despite changing economic conditions. Similarly, there can be no certainty that a bank will actually provide a proposed loan for a license applicant, or that the specified terms will be followed. A license application may not succeed for years, or at all; market factors may shift dramatically in the interim. Accordingly, the Commission requires only that a loan commitment letter establish a "reasonable assurance," not a binding legal certainty, that a loan will be available.[32] This approach is particularly appropriate because a commitment letter is the product of bargaining. The applicant, naturally, wants as strong a commitment letter as possible without conceding undue advantages in the form of higher interest rates or excessive collateral. The bank seeks to cement relations with a potential customer without specifying terms that may prove costly.

**24.** *Crowder v. FCC,* 130 U.S.App.D.C. 198, 200, 399 F.2d 569, 571, *cert. denied,* 393 U.S. 962, 89 S.Ct. 400, 21 L.Ed.2d 375 (1968).

**25.** *Central Florida Enterprises, Inc. v. FCC,* No. 76–1742 (D.C. Cir., Sept. 25, 1978), at 3–7; *Citizens Communications Center v. FCC,* 145 U.S.App.D.C. 32, 37–41, 447 F.2d 1201, 1206–10 (1971), *clarification granted,* 463 F.2d 822, 149 U.S.App.D.C. 419 (1972); *Fidelity Television, Inc. v. FCC,* 515 F.2d 684, 705–17, 169 U.S. App.D.C. 225, 246–258 (Bazelon, C. J.) (voting to grant rehearing en banc), *cert. denied,* 423 U.S. 926, 96 S.Ct. 271, 46 L.Ed.2d 253 (1975).

**26.** *FCC v. WOKO, Inc.,* 329 U.S. 223, 226–27, 67 S.Ct. 213, 91 L.Ed. 204 (1946); *Independent Broadcasting Co. v. FCC,* 89 U.S.App.D.C. 396, 398, 193 F.2d 900, 902 (1951), *cert. denied,* 344 U.S. 837, 73 S.Ct. 14, 97 L.Ed. 652 (1952); *Crowder v. FCC, supra,* 130 U.S.App.D.C. at 200, 399 F.2d at 571.

**27.** *FCC v. WOKO, supra,* at 228, 67 S.Ct. 213; *Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 396, 444 F.2d 841, 857 (1970), *cert. denied sub nom. WHDH, Inc. v. FCC,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); *Continental Broadcasting, Inc. v.*

*FCC,* 142 U.S.App.D.C. 70, 73, 439 F.2d 580, 583, *cert. denied,* 403 U.S. 905, 91 S.Ct. 2207, 29 L.Ed.2d 681 (1971); *Lorain Journal Co. v. FCC,* 122 U.S.App.D.C. 127, 134, 351 F.2d 824, 831 (1965).

**28.** Final Decision, *supra* note 4, at 1456.

**29.** 47 U.S.C. § 308(b) (Supp. V 1975) ("All applications for station licenses . . . shall set forth such facts as the Commission by regulation may prescribe as to the . . . financial . . . qualifications of the applicant"); 47 U.S.C. § 319(a) (Supp. V 1975) (same standard for construction permits).

**30.** In this case, Valley had to demonstrate that sufficient funds were available to support it for three months without revenues. J.A. 161 (No. 76–2104).

**31.** *See FCC v. Sanders Bros. Radio Station,* 309 U.S. 470, 475, 60 S.Ct. 693, 84 L.Ed. 869 (1940); *Graybar Electric Co. v. Doley,* 273 F.2d 284, 291 (4th Cir. 1959).

**32.** *E. g.,* Crosby N. Boyd, 57 F.C.C.2d 475, 488–89 (1976); Jay Sadow, 39 F.C.C.2d 808, 810 (Rev.Bd.1973).

The reasonable assurance standard is also supported by the importance of avoiding a pro-incumbent bias in comparative hearings.[33] Since incumbent licensees need not establish financial qualifications, an unrealistically stringent standard for loan commitments to competing applicants would further entrench current license holders. In *Multi-State Communications, Inc. v. FCC*, 192 U.S.App.D.C. ——, 590 F.2d 1117, (1978), this court ruled that the Commission held a loan commitment letter to an overly strict standard.

> [I]f the need for additional information and further action could be said to render the bank letter worthless, then the Commission has in essence required a legally binding commitment at the same time that it professes to require something less.

*Id.* at ——, 590 F.2d at 1119.

■ At issue in this case are Valley's loan commitment letter and its ability to finance access to its proposed transmitter site.[34] We find insufficient support for the Commission's finding that its bank letter did not meet the reasonable assurance standard, and remand for review of its overall financial qualifications.

### A. The Bank Loan Commitment Letter

Valley's application relied on a $1 million loan from the Nevada State Bank to pay for acquisition of land and broadcast equipment, with those assets to serve as collateral.[35] Valley then decided to lease its land and buildings and buy equipment on credit, with the equipment supplier holding the first lien on the machinery, so the bank modified its commitment in a subsequent

letter.[36] The question of collateral under the revised terms was not resolved to the ALJ's satisfaction, so eleven interrogatories were served on the bank on this point. The bank's replies convinced the ALJ that the bank might require additional collateral for the loan, and thus that Valley "failed to carry its burden of proving that it is financially qualified to construct and operate its proposed station."[37] The Commission affirmed this ruling.[38]

The answers to the first two interrogatories established that the bank knew that Valley planned to buy equipment on credit and give the manufacturer an exclusive lien on the equipment. In view of this, the third question asked, did the bank "remain willing to make its proposed loan" as outlined in the commitment letters? The bank's answer was, "Yes."[39] Subsequent queries showed that the bank also knew that Valley planned to lease, not purchase, its facilities. The last three questions and answers were crucial:

9. Is Nevada State Bank willing to make the proposed $1 million loan to Valley on the terms and conditions specified in the Colvin Smith letter of August 23, 1971, and the Samuel Lionel letter of February 22, 1973, if the collateral for the loan offered to the Bank by Valley does not include any land or buildings or any of the $1,470,000 of broadcast technical equipment Valley proposes to purchase from RCA Corp., but includes only (a) all personal property of Valley which was not encumbered by credit agreements with RCA, (b) assignment of Valley's accounts receivable after it

---

**33.** *See cases* cited in note 25 *supra.*

**34.** The ALJ also found that Valley was not assured network affiliation. Since the bank letter was contingent on such affiliation, Valley's financial prospects were even darker for the ALJ. Initial Decision, *supra* note 2, at 1503. The Commission reversed the ALJ on this question, finding that Valley would be a strong candidate for such affiliation since its audience coverage would be "superior to that of any existing Las Vegas station," and it would provide NBC with continuing channel identification as the successor to KORK. Final

Decision, *supra* note 4, at 1451–52. We see no basis for disturbing the FCC's ruling on this point.

**35.** J.A. 356 (No. 76–2104).

**36.** *Id.* at 357.

**37.** Initial Decision, *supra* note 2, at 1506.

**38.** Final Decision, *supra* note 4, at 1453.

**39.** *Id.* at 1479.

begins operations, (c) pledge of all outstanding capital stock of Valley without the stockholders giving up any voting rights; and (d) personal guarantees of all Valley stockholders?

> Answer: If the conditions stated will in fact exist at the time the loan is required, Nevada State Bank will make the loan in accordance with the terms stated in the August 23, 1971 letter of Mr. Colvin Smith, Jr. and the February 22, 1973 letter of Samuel S. Lionel, if Nevada State Bank and its correspondent bank feel that those conditions, together with other conditions then existing make the loan a proper one.

10. Is the Nevada State Bank willing to loan Las Vegas Valley up to $1,000,000 under the terms and conditions specified in the August 23, 1971, and February 22, 1973 letters if neither broadcasting equipment nor real property are available for collateral?

> Answer: If the conditions stated will in fact exist at the time the loan is required, Nevada State Bank will make the loan in accordance with the terms stated in the August 23, 1971 letter of Mr. Colvin S. Smith, Jr. and the February 22, 1973 letter of Samuel S. Lionel, if Nevada State Bank and its correspondent bank feel that those conditions, together with other conditions then existing make the loan a proper one.

11. In addition to the personal guarantees by Valley's stockholders, what is the minimum value of collateral that the bank will require in order to loan Valley up to $1,000,000 as proposed?

> Answer: It will depend upon the conditions existing at the time the loan is required.[40]

The ALJ characterized the answers to questions 9 and 10 as containing "routine reservations," but thought the bank's final answer introduced a fatal uncertainty into the bank's commitment.[41] As we read the record before us, this interpretation, as adopted by the Commission,[42] is without substantial support.[43]

The bank's identical responses to interrogatories 9 and 10 stated its willingness to go forward with the loan even if no land, buildings or broadcast equipment were available for collateral. The bank did reserve the right to reevaluate the commitment in light of future conditions, but this reservation did not bother the ALJ. In this context, it was illogical for Valley to be found unqualified on the basis of the answer to interrogatory 11, that the collateral required "will depend on the conditions existing at the time the loan is required."[44] The initial bank letter, which on its face satisfied the Commission, provided that the station's assets would constitute the bank's security for the loan. The bank knew that Valley's change in financial plan reduced those assets, but the bank maintained its commitment to the loan. To require more of a license applicant would exceed the boundaries of the reasonable assurance standard.

### B. *Site Access*

Valley proposed to locate its transmitter on Black Mountain, near Las Vegas. Al-

---

40. *Id.* at 1479–80.

41. Initial Decision, *supra* note 2, at 1504.

42. Final Decision, *supra* note 4, at 1452–53.

43. We note that all of the evidence on this issue involves written material, so there is no question of the credibility of a witness, a matter on which considerable deference would ordinarily be granted the finder of fact.

44. Initial Decision, *supra* note 2, at 1480.
A plausible explanation for the difference between the answer to interrogatory 11, and two previous answers, would focus on the form of the questions. The first two queries asked if the bank would make the loan in light of certain circumstances. The bank replied affirmatively, and stated its "routine reservations." Interrogatory 11, however, asked directly about the collateral term. No greater uncertainty was introduced by the bank's answer than already inhered in its two earlier answers. Only the affirmation of willingness to go forward, which was not the subject of the question, was absent.

though the site is owned by the federal government, access is limited to two private roads: one controlled by the Bell Telephone Co. of Nevada and one owned by Alta Development Co., a company held in equal shares by Western, the incumbent licensee, and the Summa Corporation.[45] Valley purchased a right-of-way from the telephone company, but negotiations with Alta broke down. Even though Valley earmarked $100,000 to acquire a right-of-way, Western said the selling price was $190,000. In view of the uncertainty surrounding this issue, the ALJ ruled that Valley failed to meet its burden of proof,[46] and the Commission agreed.[47] Although both the ALJ and the Commission recognized the difficulties of bargaining with a competing license applicant on a key matter, these difficulties were consequences of Valley's own choice of transmitter sites.[48]

We are not advised whether the Commission believes that the site access problem, by itself, would warrant a finding of financial disqualification. We note that the financial dimensions of the site access issue are much more modest than the difficulties raised by the possible failure of the bank loan. Moreover, since the Nevada State Bank letter has expired by its own terms, Valley must present a new bank loan commitment to the Commission to establish its qualifications.[49] The impact of a future bank letter on Valley's overall financial condition, including the site access situation, is uncertain. We do not foreclose Commission consideration of Valley's complete financial qualifications.

Accordingly, the Commission's order in No. 76–2124 is affirmed, and its order in No. 76–2104 is reversed and remanded.

*So ordered.*

J. SKELLY WRIGHT, Chief Judge, concurring in part and dissenting in part:

I concur in the court's opinion affirming the Commission's order in No. 76–2124. Unlike the court here, I would also affirm the Commission's order in No. 76–2104. In that case the Commission found that Valley did not meet its statutory burden of proving it was financially qualified to construct and operate a television station.* Rather than remand to allow Valley to remedy the defects the Commission found in its application *post hoc,* in my judgment the Commission should be directed to invite new applications for the license to be filed. *Compare Office of Communication of United Church of Christ v. FCC,* 138 U.S.App.D.C. 112, 425 F.2d 543 (1969).

---

45. Valley would also have to acquire a permit from the Federal Bureau of Land Management, but the ALJ concluded that it would have no difficulty doing so. Initial Decision, *supra* note 2, at 1505.

46. *Id.*

47. Final Decision, *supra* note 4, at 1453–54.

48. *Id.* at 1454; Initial Decision, *supra* note 2, at 1505.

49. Western, as an Intervenor in No. 76–2104, contends that since Valley's initial bank letter and a subsequent letter have both expired, this case is now moot. We note, however, that the Commission does not view the matter as moot, and that Valley remains a diligent litigant. Considering the business difficulties of maintaining a viable bank letter through a lengthy appeal, and the continuing impact of the Commission's action on Valley's attempt to win a broadcast license, we do not find a mootness problem. *Cf. Arizona Public Service Co. v. FPC,* 157 U.S.App.D.C. 272, 274–275, 483 F.2d 1275, 1277–78 n. 3 (1973). Due to our decision on the Nevada State Bank letter, we do not reach Valley's claim that the Commission erred in denying its petition to submit a subsequently obtained bank letter.

* The Commission found, on substantial evidence, that Valley did not prove an essential $1 million dollar bank loan would be available to finance the proposed station and did not show it could finance access to its proposed transmitter site.